835 A.2d 1105

**Steven Howard OKEN**

v.

**STATE of Maryland.**

**No. 117, Sept. Term, 2002.**

Court of Appeals of Maryland.

Nov. 17, 2003.

180

Fred Warren Bennett (Michael E. Lawlor, Bennett & Nathans, LLP, on brief), Greenbelt, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Kent S. Scheidegger, Kymberlee C. Stapleton, Criminal Justice Legal Foundation, Sacramento, CA, brief of Amici Curiae of the Criminal Justice Legal Foundation, Frederick Joseph Romano and Frederick Anthony Romano, Supporting Affirmance.

Argued Before BELL, C.J., and ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

It is Maryland's turn to consider the effect, if any, of the U.S. Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), upon its capital punishment statutory scheme. At least eleven state supreme courts have preceded us in pondering the same question as regards their respective statutes.[1] Of those states, four, Arizona, Colorado, Missouri, and Nevada, concluded that *Ring*

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. *See Ex Parte Hodges*, 856 So.2d 936 (Ala.2003); *Ex Parte Waldrop*, 859 So.2d 1181, 2002 WL 31630710 (Ala.2002); *State v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003); *People v. Prieto*, 30 Cal.4th 226, 133 Cal. Rptr.2d 18, 66 P.3d 1123 (2003); *People v. Navarette*, 30 Cal.4th 458, 133 Cal.Rptr.2d 89, 66 P.3d 1182 (2003); *Woldt v. People*, 64 P.3d 256 (Colo.2003); *Brice v. State*, 815 A.2d 314 (Del.2003); *Bottoson v. Moore*, 833 So.2d 693 (Fla.2002); *People v. Ballard*, 206 Ill.2d 151, 276 Ill.Dec. 538, 794 N.E.2d 788 (2002); *State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003); *Johnson v. State*, 59 P.3d 450 (Nev.2002); *Torres v. State*, 58 P.3d 214 (Okla.Crim.App.2002). In *Olsen v. State*, relied on by the dissent, the Supreme Court of Wyoming addressed the burden of persuasion in the process of weighing aggravating against mitigating factors under Wyoming's death penalty statute; however, the court did not consider the effect of *Ring* upon Wyoming's capital punishment scheme. *Olsen v. State*, 67 P.3d 536, 576, 590 (Wyo.2003).

compelled invalidation of some part of their statutes as written. The remaining six states, Alabama, California, Delaware, Florida, Illinois, and Oklahoma, concluded that *Ring* had no ill effect on their statutory schemes. For reasons to be explained *infra*, we determine that *Ring* does not affect adversely the Maryland statute.

## I.

The present case is Mr. Oken's fourth in this Court, *see Oken v. State*, 367 Md. 191, 786 A.2d 691 (2001), *cert. denied*, 535 U.S. 1074, 122 S.Ct. 1953, 152 L.Ed.2d 855 (2002) (*Oken III*) (application for leave to appeal denials of motion to reopen post-conviction case and motion to correct illegal sentence, both based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); *Oken v. State*, 343 Md. 256, 681 A.2d 30 (1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997) (*Oken II*) (post-conviction case); *Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) (*Oken I*) (direct appeal).[2] *Oken III* was the result of Oken filing three pleadings in the Circuit Court for Baltimore County, all addressing the applicability of *Apprendi* to the Maryland death penalty statute: (1) a Motion to Correct Illegal Sentence and/or Motion for New Sentencing Based on Mistake or Irregularity; (2) a Motion for New Trial (filed by Mr. Oken, *pro se*); and (3) a Motion to Reopen Post–Conviction Proceeding. All were denied. This Court granted Oken's Application for Leave to Appeal and, on 14 December 2001,

---

**2.** In addition, see *Oken v. Nuth*, 64 F.Supp.2d 488 (D.Md.1999), *aff'd*, *Oken v. Corcoran*, 220 F.3d 259 (4th Cir.2000), *cert. denied*, 531 U.S. 1165, 121 S.Ct. 1126, 148 L.Ed.2d 992 (2001), Oken's federal habeas corpus petition. *See also Oken v. Nuth*, 30 F.Supp.2d 877 (detailing the procedural history of Oken's habeas corpus petition, including Oken's motion to declare Maryland a non-opt-in State under the Anti Terrorism Death Penalty Act). Subsequent to his conviction in this case for the murder of Dawn Garvin, Oken pled guilty to the murder of Patricia Hirt. *See Oken v. State*, 327 Md. 628, 644 n. 4, 612 A.2d 258, 266 n. 4 (1992), *cert denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993). Little more need be said in this opinion regarding the facts underlying Oken's convictions in the present case.

denied relief on the *Apprendi* claim.[3] A petition for *Writ of Certiorari* was denied by the U.S. Supreme Court on 13 May 2002. *Oken v. Maryland,* 535 U.S. 1074, 122 S.Ct. 1953, 152 L.Ed.2d 855 (2002).

On 27 January 2003, a Warrant of Execution issued from the Circuit Court for Baltimore County commanding that Oken be executed at some time during a five day period commencing 17 March 2003. Also on 17 March, Oken filed in the Circuit Court for Baltimore County a Motion to Correct Illegal Sentence and/or Motion for New Sentencing Based Upon Mistake or Irregularity. The motion argued that the U.S. Supreme Court's decision in *Ring* overruled, *sub silentio,* this Court's decisions in *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001), *cert denied* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002) and *Oken III.* On 29 January 2003, the Circuit Court denied the Motion to Correct Illegal/Irregular Sentence.[4] Oken thereafter filed a Notice of Appeal. On 10 February 2003, Oken filed in this Court a Motion for Stay of Execution. On 11 February 2003, we issued an Order granting the request for a stay of execution, pending resolution of the present case.

As he did in *Oken III,* Oken claims that his death sentence for the murder of Dawn Garvin in November of 1987 is illegal and irregular, as those terms are used in Maryland Rule 4–345,[5] because Maryland's death penalty statute unconstitution-

---

**3.** The complete rationale for this Court's rejection of the *Apprendi* claim is contained in *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001), decided one day prior to the filing of our opinion in *Oken III.*

**4.** The Motion to Reopen was denied on 11 February 2003. An Application for Leave to Appeal that decision was filed with this Court on 11 March 2003 and denied.

**5.** Rule 4–345 states in relevant part:

(a) *Illegal sentence*—The court may correct an illegal sentence at any time.

(b) *Modification or reduction—Time for.* The court has revisory power and control over a sentence upon a motion filed within 90 days after its imposition (1) in the District Court, if an appeal has not been perfected, and (2) in a circuit court, whether or not an appeal

ally provides for the imposition of the death sentence if the sentencing authority determines, by a preponderance of the evidence, that aggravating circumstances outweigh any mitigating circumstances. Throughout the years since Maryland's last major overhaul of its capital punishment statute in obedience to the holdings of the U.S. Supreme Court, and most recently in *Borchardt* and *Oken III* (adopting *Borchardt* as dispositive), this Court has concluded otherwise.[6] In the present case, Oken argues that *Borchardt* has been overruled by *Ring* and, therefore, the Circuit Court judge erred when he declined to invalidate Oken's sentence of death.

## II.

■ Petitioner presents the following questions for our consideration:

I. Whether, in light of *Ring v. Arizona*, this Court should overrule *Borchardt v. State* and hold that the Maryland death penalty statute is unconstitutional on its face because it provides that a sentence of death may be imposed if the State proves only that the aggravating factors outweigh any mitigating factors by a preponderance of the evidence.

II. Whether, on collateral review, this Court can reach the merits of Mr. Oken's *Apprendi/Ring* arguments as the application of the Supreme Court's decisions in

---

has been filed. Thereafter, the court has revisory power and control over the sentence in case of fraud, mistake, or irregularity, or as provided by section (e) of this Rule.

**6.** *See Ware v. State,* 360 Md. 650, 712–13, 759 A.2d 764, 797 (2000); *Conyers v. State,* 354 Md. 132, 197–99, 729 A.2d 910, 945 (1999); *Ball v. State,* 347 Md. 156, 206–07, 699 A.2d 1170, 1194 (1997); *Burch v. State,* 346 Md. 253, 299, 696 A.2d 443, 466 (1997); *Clermont v. State,* 348 Md. 419, 456, 704 A.2d 880, 898 (1998); *Perry v. State,* 344 Md. 204, 247–48, 686 A.2d 274, 295 (1996); *Grandison v. State,* 341 Md. 175, 231–32, 670 A.2d 398, 425 (1995); *Whittlesey v. State,* 340 Md. 30, 82–83, 665 A.2d 223, 248–49 (1995); *Wiggins v. State,* 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991); *Collins v. State,* 318 Md. 269, 296, 568 A.2d 1, 14 (1990); *Tichnell v. State,* 287 Md. 695, 728–34, 415 A.2d 830, 848–50 (1980).

> *Apprendi* and *Ring* to the Maryland death penalty scheme represent a new rule of constitutional law that fundamentally alters the standard of proof and the manner in which capital sentencing hearings are to be conducted in this State.

III. Do special circumstances exist which excuse Mr. Oken's failure to raise the standard of proof issue on direct appeal or in his first previous post-conviction proceeding?

IV. Whether a capital sentencing proceeding that employs an unconstitutionally low standard of proof results in the imposition of an illegal or irregular sentence.

Because, as to Petitioner's first issue, we find that *Ring* bears no adverse implications for the Maryland death penalty statute, we do not reach petitioner's other issues.[7] We shall affirm the judgment of the Circuit Court.

## III.

The U.S. Supreme Court has been diligent in developing death penalty jurisprudence in the twenty-plus years since *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d

---

7. With regard to Petitioner's first issue, he broadly asserts at the beginning and end of his argument that, because the Maryland death penalty statute provides that the weighing of aggravating circumstances against mitigating circumstances is by a preponderance of the evidence standard, the statute "violates the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Articles 16, 21, 23, 24, and 25 of the Maryland Constitution." (Petitioner's Brief at 17, 31). The majority of Petitioner's argument, however, is devoted almost entirely to arguing the Sixth, Eighth and Fourteenth Amendment issues that were the focus of *Apprendi, Ring,* and *Borchardt* and rightfully so. The principal reason this case was taken by the Court is to determine if *Ring* affects *Borchardt.* Petitioner presents no meaningful, additional supporting arguments indicating that the Supreme Court's decision in *Ring* should change this Court's previously articulated understanding of the federal Fifth Amendment, and/or the Maryland constitutional provisions in a way that would make the Maryland death penalty statute constitutional. *See e.g. Borchardt,* 367 Md. at 127–28 n.6, 786 A.2d at 652–53 n.6 (as to Art. 24 of the Maryland Declaration of Rights). We therefore address only the Sixth, Eighth, and Fourteenth Amendment implications of Petitioner's first issue.

346 (1972), with the result that this department of the law is now a labyrinth. In order to navigate this cat's cradle, as well as to understand the underpinnings of our decision in the case *sub judice* in light of the Supreme Court's jurisprudence in this arena, it is necessary to review its development since *Furman*. Fortunately, much of that history is found in a single place, the concurring opinion of Justice Scalia in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), a case of some import to the matter before us. Although extensive block quotations are the bane of readers of, and commentators upon, appellate opinions, we are moved at the beginning to quote in detail from Justice Scalia's concurrence because it traces up to that point the lineage of two lines of the Supreme Court's relevant jurisprudence regarding death penalty statutes, which lines culminate in *Ring*. As Justice Scalia explains:

Over the course of the past 15 years, this Court has assumed the role of rulemaking body for the States' administration of capital sentencing—effectively requiring capital sentencing proceedings separate from the adjudication of guilt, see, *e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 301–305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 195, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion announcing judgment), dictating the type and extent of discretion the sentencer must and must not have, see, e.g., *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), requiring that certain categories of evidence must and must not be admitted, see, *e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), undertaking minute inquiries into the wording of jury instructions to ensure that jurors understand their duties under our labyrinthine code of rules, see, *e.g.*, *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and prescribing the procedural

forms that sentencing decisions must follow, see, *e.g.*, *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). The case that began the development of this Eighth Amendment jurisprudence was *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) *(per curiam),* which has come to stand for the principle that a sentencer's discretion to return a death sentence must be constrained by specific standards, so that the death penalty is not inflicted in a random and capricious fashion.

In *Furman,* we overturned the sentences of two men convicted and sentenced to death in state courts for murder and one man so convicted and sentenced for rape, under statutes that gave the jury complete discretion to impose death for those crimes, with no standards as to the factors it should deem relevant. The brief *per curiam* gave no reasons for the Court's decision, other than to say that "the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Id.,* at 239–240[, 92 S.Ct. 2726]. To uncover the reasons underlying the decision in *Furman,* one must turn to the opinions of the five Justices forming the majority, each of whom wrote separately and none of whom joined any other's opinion. Of these opinions, two rested on the broadest possible ground—that the death penalty was cruel and unusual punishment in all circumstances. See *id.,* at 305[, 92 S.Ct. 2726] (BRENNAN, J., concurring); *id.,* at 369–371[, 92 S.Ct. 2726] (MARSHALL, J., concurring). A third, that of Justice Douglas, rested on a narrower ground—that the discretionary capital sentencing systems under which the petitioners had been sentenced were operated in a manner that discriminated against racial minorities and unpopular groups. See *id.,* at 256–257[, 92 S.Ct. 2726] (concurring opinion).

The critical opinions, however, in light of the subsequent development of our jurisprudence, were those of JUSTICES Stewart and WHITE. They focused on the infrequency and seeming randomness with which, under the

discretionary state systems, the death penalty was imposed. Justice Stewart wrote:

"These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.... The Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.*, at 309–310[, 92 S.Ct. 2726] (concurring opinion) (footnotes omitted).

JUSTICE WHITE took a similar view. In his opinion the death sentences under review violated the Eighth Amendment because "as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice." *Id.*, at 313[, 92 S.Ct. 2726]. "There is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not," *ibid.*, so that it constitutes a "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes," *id.*, at 312[, 92 S.Ct. 2726]. The opinions of both Justice Stewart and JUSTICE WHITE went out of the way to say that capital punishment was not in itself a cruel and unusual punishment, and that a mandatory system of capital sentencing, in which everyone convicted of a particular crime received that punishment, would "present quite different issues." *Id.*, at 310–311[, 92 S.Ct. 2726] (WHITE, J., concurring); see also *id.*, at 307–308[, 92 S.Ct. 2726] (Stewart, J., concurring).

*Furman* led at least 35 States to adopt new capital sentencing procedures that eliminated some of the discretion previously conferred to impose or withhold the death penalty. See *Gregg v. Georgia, supra,* at 179[, 96 S.Ct. 2909]. In 1976, we upheld against Eighth Amendment

challenge three "guided discretion" schemes. representative of these measures, which, in varying forms, required the sentencer to consider certain specified aggravating and mitigating circumstances in reaching its decision. In the principal case, *Gregg v. Georgia, supra* the three-Justice opinion announcing the judgment read *Furman* as "mandating that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that *discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action,*" *id.,* at 189[, 96 S.Ct. 2909] (joint opinion of Stewart, Powell, and STEVENS, JJ.) (emphasis added). See also *id.,* at 221–222[, 96 S.Ct. 2909] (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment); *Proffitt v. Florida,* 428 U.S. 242, 251, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); *id.,* at 260[, 96 S.Ct. 2960] (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); *id.,* at 279[, 96 S.Ct. 2950] (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment).

Since the 1976 cases, we have routinely read *Furman* as standing for the proposition that "channeling and limiting ... the sentencer's discretion in imposing the death penalty" is a "fundamental constitutional requirement," *Maynard v. Cartwright,* 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and have insisted that States furnish the sentencer with " 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death,' " *Godfrey v. Georgia,* 446 U.S. at 428[, 100 S.Ct. 1759] (footnotes omitted). Only twice since 1976 have we actually invalidated a death sentence because of inadequate guidance to the sentencer, see *Maynard,* 486 U.S. at 362–364[, 108 S.Ct. 1853]; *Godfrey,* 446 U.S. at 428–429, 433[, 100 S.Ct.

1759], but we have repeatedly incanted the principle that "unbridled discretion" is unacceptable, *Penry v. Lynaugh*, 492 U.S. 302, 326, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that capital sentencing procedures must constrain and guide the sentencer's discretion to ensure "that the death penalty is not meted out arbitrarily and capriciously," *California v. Ramos*, 463 U.S. 992, 999, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), that "the State must establish rational criteria that narrow the decisionmaker's judgment," *McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), that "death penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion," *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), that our cases require "procedural protections . . . to ensure that the death penalty will be imposed in a consistent, rational manner," *Barclay v. Florida*, 463 U.S. 939, 960, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (STEVENS, J., concurring in judgment), and that "[States] must administer [the death] penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not," *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). See also *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Pulley v. Harris*, 465 U.S. 37, 51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Booth v. Maryland*, 482 U.S. at 502[, 107 S.Ct. 2529]; *Mills v. Maryland*, 486 U.S. at 374[, 108 S.Ct. 1860]; *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

Shortly after introducing our doctrine *requiring* constraints on the sentencer's discretion to "impose" the death penalty, the Court began developing a doctrine *forbidding* constraints on the sentencer's discretion to "*decline* to impose" it. *McCleskey v. Kemp, supra*, at 304[, 107 S.Ct. 1756] (emphasis deleted). This second doctrine—counterdoctrine would be a better word—has completely exploded

whatever coherence the notion of "guided discretion" once had.

Some States responded to *Furman* by making death the mandatory punishment for certain categories of murder. We invalidated these statutes in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), a plurality of the Court concluding that the sentencing process must accord at least some consideration to the "character and record of the individual offender." *Woodson*, *supra*, at 304[, 96 S.Ct. 2978] (plurality opinion). Other States responded to Furman by leaving the sentencer some discretion to spare capital defendants, but limiting the kinds of mitigating circumstances the sentencer could consider. We invalidated these statutes in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality saying the Eighth Amendment requires that the sentencer "not be precluded from considering, as a mitigating factor, *any aspect* of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id.*, at 604[, 98 S.Ct. 2954] (opinion of Burger, C. J., joined by Stewart, Powell, and STEVENS, JJ.) (emphasis omitted and added). The reasoning of the pluralities in these cases was later adopted by a majority of the Court. See *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (embracing *Woodson* ); *Eddings v. Oklahoma, supra* (embracing Lockett).

These decisions, of course, had no basis in *Furman*. One might have supposed that curtailing or eliminating discretion in the sentencing of capital defendants was not only consistent with *Furman*, but positively required by it—as many of the States, of course, *did* suppose. But in *Woodson* and *Lockett*, it emerged that uniform treatment of offenders guilty of the same capital crime was not only not *required* by the Eighth Amendment, but was all but *prohibited*. Announcing the proposition that "central to the application of the [Eighth] Amendment is a determination of

contemporary standards regarding the infliction of punishment," *Woodson, supra,* at 288[, 96 S.Ct. 2978], and pointing to the steady growth of discretionary sentencing systems over the previous 150 years (those very systems we had found unconstitutional in *Furman* ), *Woodson, supra,* at 291–292[, 96 S.Ct. 2978], the pluralities in those cases determined that a defendant could not be sentenced to death unless the sentencer was convinced, by an unconstrained and unguided evaluation of offender and offense, that death was the appropriate punishment, *id.,* at 304–305[, 96 S.Ct. 2978]; *Lockett, supra,* 438 U.S. at 604–605[, 98 S.Ct. 2954]. In short, the practice which in *Furman* had been described as the discretion to sentence to death and pronounced constitutionally prohibited, was in *Woodson* and *Lockett* renamed the discretion not to sentence to death and pronounced constitutionally required.

As elaborated in the years since, the *Woodson Lockett* principle has prevented States from imposing all but the most minimal constraints on the sentencer's discretion to decide that an offender eligible for the death penalty should nonetheless not receive it. We have, in the first place, repeatedly rebuffed States' efforts to channel that discretion by specifying objective factors on which its exercise should rest. It would misdescribe the sweep of this principle to say that "all mitigating evidence" must be considered by the sentencer. That would assume some objective criterion of what is mitigating, which is precisely what we have forbidden. Our cases proudly announce that the Constitution effectively prohibits the States from excluding from the sentencing decision *any* aspect of a defendant's character or record, or *any* circumstance surrounding the crime ...

\* \* \* \* \*

To acknowledge that "there perhaps is an inherent tension" between this line of cases and the line stemming from *Furman, McCleskey v. Kemp,* 481 U.S. at 363[, 107 S.Ct. 1756] (BLACKMUN, J., dissenting), is rather like saying that there was perhaps an inherent tension between the

Allies and the Axis Powers in World War II. And to refer to the two lines as pursuing "twin objectives," *Spaziano v. Florida*, 468 U.S. at 459[, 104 S.Ct. 3154], is rather like referring to the twin objectives of good and evil. They cannot be reconciled. Pursuant to *Furman*, and in order "to achieve a more rational and equitable administration of the death penalty," *Franklin v. Lynaugh*, 487 U.S. 164, 181, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), we require that States "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,'" *Godfrey v. Georgia*, 446 U.S. at 428[, 100 S.Ct. 1759]. In the next breath, however, we say that "the State *cannot* channel the sentencer's discretion . . . to consider any relevant [mitigating] information offered by the defendant," *McCleskey v. Kemp, supra*, at 306[, 107 S.Ct. 1756] (emphasis added), and that the sentencer must enjoy unconstrained discretion to decide whether any sympathetic factors bearing on the defendant or the crime indicate that he does not "deserve to be sentenced to death," *Penry v. Lynaugh, supra*, at 326[, 109 S.Ct. 2934].

*Walton*, 497 U.S. at 657–65, 110 S.Ct. at 3059–63, 111 L.Ed.2d at 530–36 (plurality) (Scalia, J., concurring); *see also Ring v. Arizona*, 536 U.S. 584, 610, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556, 577 (2002) (Scalia, J., concurring).

## IV.

In response to the Supreme Court's evolving jurisprudence in this area, Maryland's death penalty statutory scheme has undergone multiple changes in the last thirty-one years. Maryland Code (1957, 1971 Repl.Vol.), Article 27, § 413, provided in relevant part that "[e]very person convicted of murder in the first degree . . . shall suffer death, or undergo a confinement in the penitentiary of the State for a the period of their natural life." This version of Art. 27, § 413 was found to be unconstitutional as regards the death penalty in *Bartholomey v. State*, 267 Md. 175, 297 A.2d 696 (1972), in response to the Supreme Court's decision in *Furman*. It was replaced by Maryland Code (1957, 1976 Repl.Vol.), Article 27, § 413, appli-

cable to offenses committed on or after 1 July 1975, which in turn was found to be unconstitutional in *Blackwell v. State,* 278 Md. 466, 365 A.2d 545 (1976).[8]  The statute declared unconstitutional in *Blackwell* was replaced by renumbered Maryland Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.), Article 27, § 412, applicable to offenses committed on or after 1 July 1978.   This version has remained substantively unchanged and is the first version of the current Maryland death penalty scheme, along with Maryland Code (1957, 1976 Repl. Vol., 1978 Cum.Supp.), §§ 413 and 414, containing the additional sentencing and review elements at issue in the present case.   Additional minor amendments were made in 1995 and 1996.   Article 27, §§ 412, 413, and 414 were repealed by Ch. 26, Acts 2002, effective October 1, 2002 and re-enacted without substantive change as Maryland Code (1974, 2002 Repl.Vol., 2003 Supp.), Criminal Law Article, §§ 2–101, 2–201, 2–202, 2–203, 2–301, 2–302, 2–303 and 1–401.[9]

Because Oken was convicted prior to the 2002 re-enactment of the Code and to avoid confusion by using citation forms differing from our opinions decided prior to that re-enactment, we shall address Oken's arguments referring to the Code sections as they existed prior to the 2002 re-enactment.   Maryland Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Art. 27 § 412 set forth the punishment for murder, in pertinent part, as follows:

(a) *Designation of degree by court or jury.*—If a person is found guilty of murder, the court or jury that determined the person's guild shall state in the verdict whether the person is guilty of murder in the first degree or murder in the second degree.

(b) *Penalty for first degree murder.*—Except as provided under subsection (g) of this section, a person found guilty of murder in the first degree shall be sentenced to death,

---

8.  *See State v. Wooten,* 277 Md. 114, 118 n. 4, 352 A.2d 829, 832 n. 4 (1976); *Blackwell,* 278 Md. at 473–75, 365 A.2d at 549–50.

9.  For provisions controlling the effective date and application of statutory revisions, see Md. Const., Article XVI, § 2.

imprisonment for life, or imprisonment for life without the possibility of parole. The sentence shall be imprisonment for life unless: (1)(i) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon which it intended to rely, and (ii) a sentence of death is imposed in accordance with § 413; or (2) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of imprisonment for life without the possibility of parole under § 412 or § 413 of this article.

(c) *Notice of intent to seek death penalty.*—(1) If a State's Attorney files or withdraws a notice of intent to seek a sentence of death, the State's Attorney shall file a copy of the notice or withdrawal with the clerk of the Court of Appeals.

(2) The validity of a notice of intent to seek a sentence of death that is served on a defendant in a timely manner shall in no way be affected by the State's Attorney's failure to file a copy of the death notice in a timely manner with the clerk of the Court of Appeals.

Maryland Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Art. 27 § 413 sets forth the sentencing procedure upon a finding of guilt as to first degree murder as follows:

(a) *Separate sentencing proceeding required.*—If a person is found guilty of murder in the first degree, and if the State had given the notice required under § 412(b), a separate sentencing proceeding shall be conducted as soon as practicable after the trial as been completed to determine whether he shall be sentenced to death.

(b) *Before whom proceeding conducted.*—The proceeding shall be conducted:

(1) Before the jury that determined the defendant's guilt; or

(2) Before a jury impaneled for the purpose of the proceeding if;

(i) The defendant was convicted upon a plea of guilty;

(ii) The defendant was convicted after a trial before the court sitting without a jury;

(iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or

(iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant.

(c) *Evidence; argument; instructions.*—(1) The following type of evidence is admissible in this proceeding:

(i) Evidence relating to any mitigating circumstance listed in subsection (g) of this section;

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of this section of which the State had notified the defendant pursuant to § 412(b) of this article.

(iii) Evidence of any prior criminal convictions, pleas or guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extend admissible in other sentencing procedures.;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.

(2) The State and the defendant or his counsel may present argument for or against the sentence of death.

(3) After presentation of the evidence in a proceeding before a jury, in addition to any other appropriate instructions permitted by law, the court shall instruct the jury as to the findings it must make in order to determined whether the sentence shall be death, imprisonment for life, and the burden of proof applicable to these findings in accordance with subsection (f) or subsection (h) of this section.

(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

(1) One or more persons committed the murder of a law enforcement officer while in the performance of his duties;

(2) The defendant committed the murder at a time when he was confined in any correctional institution;

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer;

(4) The victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct;

(5) The victim was a child abducted in violation of § 2 of this article;

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise or remuneration to commit the murder;

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration;

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life.

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident; or

(10) The defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery under § 486 or § 487 of this article, arson in the first degree, rape or sexual offense in the first degree.

(e) *Definitions.*—As used in this section, the following terms have the meanings indicated unless a contrary mean-

ing is clearly intended from the context in which the term appears:

(1)(i) The terms "defendant" and "person", except as those terms appear in subsection (d)(1) and (7) of this section, include only a principal in the first degree.

(ii) In subsection (d)(1) of this section, the term "person" means:

1. A principal in the first degree

2. A principal in the second degree who:

A. Willfully, deliberately, and with premeditation intended the death of the law enforcement officer;

B. Was a major participant in the murder; and

C. Was actually present at the time and place of the murder.

(2) The term "correctional institution" includes any institution for the detention or confinement of persons charged with or convicted of a crime, including Patuxent Institution, any institution for the detention or confinement of juveniles charged with or adjudicated as being delinquent, and any hospital in which the person was confined pursuant to an order of a court exercising criminal jurisdiction.

(3)(i) The term "law enforcement officer" has the meaning given in § 727 of this article.

(ii) The term "law enforcement officer", as used in subsection (d) of this section, includes:

1. An officer serving in a probationary status;

2. A parole and probation officer;

3. A law enforcement officer of a jurisdiction outside of Maryland; and

4. If the law enforcement officer is wearing the uniform worn by the law enforcement officer while acting in an official capacity or is prominently displaying his official badge or other insignia of office, a law enforcement officer privately employed as a security officer or special policeman under the provisions of Article 41 §§ 4–901 through 4–913 of the Code.

(4) "Imprisonment for life without the possibility of parole" means imprisonment for the natural life of an inmate under the custody of a correctional institution, including the Patuxent Institution.

(f) *Finding that no aggravating circumstances exist.*—If the court or jury does not find, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall state that conclusion in writing, and a sentence of death may not be imposed.

(g) *Consideration of mitigating circumstances.*—If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgement entered on a charge of a crime of violence. As used in this paragraph, "crime of violence" means abduction, arson in the first degree, escape in the first degree, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery under § 486 or § 487 of this article, carjacking or armed carjacking, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.

*(h) Weighing aggravating and mitigating circumstances.—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.*

*(2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.*

*(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed.*

(i) *Determination to be written and unanimous.*—The determination of the court or jury shall be in writing, and, if a jury, shall be unanimous and shall be signed by the foreman.

(j) *Statements required in determination.*—The determination of the court or jury shall state, specifically:

(1) Which, if any, aggravating circumstances it finds to exist;

(2) Which, if any, mitigating circumstances it finds to exist;

(3) Whether any aggravating circumstances found under subsection (d) of this section outweigh the mitigating circumstances found under subsection (g) of this section;

(4) Whether the aggravating circumstances found under subsection (d) do not outweigh mitigating circumstances under subsection (g); and

(5) The sentence, determined in accordance with subsection (f) or (h).

(k) *Imposition of sentence.*—(1) If the jury determines that a sentence of death shall be imposed under the provisions of this section, then the court shall impose a sentence of death.

(2) If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death.

(3) If the sentencing proceeding is conducted before a court without a jury, the court shall determine whether a sentence of death shall be imposed under the provisions of this section.

(4) If the court or jury determines that a sentence of death may not be imposed, and the State did not give the notice required under § 412(b) of this article of intention to seek a sentence of life imprisonment without the possibility of parole, the court shall impose a sentence of life imprisonment.

(5) If the State gives the notice required under § 412(b) of this article of intention to seek a sentence of imprisonment for life without the possibility of parole but does not give notice of intention to seek the death penalty, the court shall conduct a separate sentencing proceeding as soon as practicable after the trial has been completed to determine whether to impose a sentence of imprisonment for life or imprisonment for life without the possibility of parole.

(6) If the State gives the notice required under § 412(b) of this article of intention to seek the death penalty in addition to the notice of intention to seek a sentence of imprisonment for life without the possibility of parole, and the court or jury determines that a sentence of death may not be imposed under the provisions of this section, that court or jury shall determine whether to impose a sentence

of imprisonment for life or imprisonment for life without the possibility of parole.

(7)(i) In determining whether to impose a sentence of imprisonment for life without the possibility of parole, a jury shall agree unanimously on the imposition of a sentence of imprisonment for life without the possibility of parole.

(ii) If the jury agrees unanimously to impose a sentence of imprisonment for life without the possibility of parole, the court shall impose a sentence of imprisonment for life without the possibility of parole.

(iii) If the jury, within a reasonable time, is not able to agree unanimously on the imposition of a sentence of imprisonment for life without the possibility of parole, the court shall dismiss the jury and impose a sentence of imprisonment for life.

(8) If the State gives the notice required under § 412 of this article of the States intention to seek a sentence of imprisonment for life without the possibility of parole, the court shall conduct a separate sentencing proceeding as soon as practicable after the trial has been completed to determine whether to impose a sentence of imprisonment for life or imprisonment for life without the possibility of parole.

(emphasis added). In addition, Article 27 provides for the mandatory review of all death sentences by this Court.[10] Maryland Code (1957, 1996 Repl.Vol.), Art. 27 § 414(e), in pertinent part provides:

(e) *Consolidation by the Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

---

**10.** *See also* Maryland Rule 8–306, applicable to review of capital cases in the Court of Appeals.

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d); and

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances.

In the *Borchardt* case, we explained Borchardt's *Apprendi* argument as to § 412(h) of Maryland's statutory scheme:

The *Apprendi* issue posited by Borchardt arises from § 413(h), dealing with the weighing of aggravating and mitigating circumstances. That section provides that, if the jury finds that one or more mitigating circumstances exist, "it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances." (emphasis added). If the jury finds that they do, the sentence is death; if it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed. The ultimate determination must be unanimous and in writing. *See* § 413(i). Borchardt contends [11] that, under *Apprendi*, due process requires a determination that the aggravating circumstances outweigh any mitigating circumstances to be made beyond a reasonable doubt and not by a mere preponderance of evidence.

Section 414, as supplemented by Maryland Rule 8–306, provides for automatic appellate review by this Court whenever the death penalty is imposed. In addition to considering any errors alleged by the defendant, we are required by § 414(e) to consider the imposition of the death sentence itself, including (1) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factor, (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance under § 413(d), and (3) whether the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances.

---

11. As does Oken in the present case.

367 Md. at 103, 786 A.2d at 638.[12]  In *Borchardt*, based only on an analysis assessing the impact of *Apprendi*, we found constitutional the standard of whether aggravating factors outweigh mitigators by a preponderance of the evidence. Oken's position here, in a nutshell, is that *Ring* requires us to revisit that holding in *Borchardt* and to find that § 413(h) is unconstitutional because, in his view, under the holdings of *Apprendi* and *Ring*, the determination that aggravating circumstances outweigh mitigating circumstances must be made based on the standard of beyond a reasonable doubt, and not by preponderance of the evidence.  We disagree.

We discussed the legal reasoning of the Supreme Court's holding in *Apprendi* in our decision in *Borchardt* as follows:

> [In *Apprendi*,] the defendant was convicted, on a plea of guilty, of using a firearm for an unlawful purpose, a second-degree offense under New Jersey law that carried a sentence range of five to ten years in prison.  There was evidence, which *Apprendi* disputed, that his offense was racially motivated—that he fired shots into the home of an African–American family because he did not want them as neighbors.  New Jersey had a separate "hate crime" statute that increased the punishment for a second-degree offense to a prison term of 10 to 20 years if the judge found, by a preponderance of the evidence, that the defendant committed the underlying offense with a purpose to intimidate an individual or group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity.  *Apprendi* was not charged under the hate crime law, and, though pleading guilty to the underlying offense, he objected to the sentence enhancement under that law.  The judge rejected the challenge and sentenced *Apprendi* to 12 years.
>
> The Supreme Court believed that the case was controlled by the footnote statement made in *Jones* [*v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ]—that

---

**12.** *See also Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980).

under the 14th Amendment (as under the Fifth and Sixth, which applied to the Federal prosecution in *Jones*) "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. at 476, 120 S.Ct. at 2355, 147 L.Ed.2d at 446 (quoting from *Jones*, 526 U.S. at 243 n. 6, 119 S.Ct. at 1224 n. 6, 143 L.Ed.2d at 326 n. 6).

*Borchardt*, 367 Md. at 112–13, 786 A.2d at 643–44.[13] Borchardt argued, as does Oken, that the weighing of aggravating against mitigating circumstances is a "finding" which increases the maximum penalty, and therefore, under *Apprendi* and *Ring*, must be "found" by a jury beyond a reasonable doubt.

Oken correctly points out that our holding in *Borchardt*, that *Apprendi* does not invalidate the Maryland death penalty scheme, rested on three pillars of reasoning. The first of these was based on language in *Apprendi* expressly indicating that its holding was not intended to apply to capital sentencing schemes, a result which would bring *Apprendi* into conflict with *Walton*. As we pointed out in *Borchardt*:

> Perhaps the easiest answer lies in the unequivocal statement by the *Apprendi* majority that its decision did not render invalid State capital sentencing schemes, such as approved in *Walton*, that allowed the judge, not sitting as the trier of fact, to find and weigh specific aggravating

---

**13.** The principal holding of the Supreme Court in *Apprendi* is:

> In sum, our reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in Jones. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case: "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 U.S. at 252–253 [119 S.Ct. 1215] (opinion of STEVENS, J.); see also 526 U.S. at 253 [119 S.Ct. 1215] (opinion of SCALIA, J.).

530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455.

factors. If it is permissible under *Apprendi* for the law to remove that fact-finding and fact-weighing process *entirely* from the jury and leave it to the judge as a legitimate sentencing factor, without specifying a reasonable doubt standard, it can hardly be impermissible for a jury that has found the prerequisite aggravating factors beyond a reasonable doubt to apply a preponderance standard in weighing them against any mitigating circumstances. The *Walton* scheme, in other words, is in far greater direct conflict with the underpinning of *Apprendi* than the Maryland approach. Thus, if the aggravating circumstances do not constitute elements of the offense or serve to increase the maximum punishment for the offense in the *Walton* context, they cannot reasonably be found to have that status under the Maryland law. *If Apprendi renders the Maryland law unconstitutional, then, perforce, it likely renders most of the capital punishment laws in the country unconstitutional.* We cannot conceive that the Supreme Court, especially in light of its contrary statement, intended such a dramatic result to flow from a case that did not even involve a capital punishment law.

367 Md. at 121–22, 786 A.2d at 649 (footnotes omitted).

Our second reason for denying relief in *Borchardt* was because *Apprendi* applies only when a defendant receives a sentence in excess of the statutory maximum. *Borchardt* noted that *Apprendi* required that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 367 Md. at 123, 786 A.2d at 650 (quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455) (emphasis removed). We observed that the statute established the penalty for murder as encompassing a range of three potential sentences: life imprisonment, life imprisonment without parole, or death. We held that the determination whether aggravators outweighed the mitigators, therefore, does not serve to increase the statutory maximum or even the statutory range of possible punishment. Rather, the existence or non-existence of the statutory circumstances served only to assist

the sentencing authority in "determining which sentence within the statutory range is to be imposed." 367 Md. at 123, 786 A.2d at 650 (emphasis removed).[14]

Third, we held in *Borchardt* that *Apprendi* did not apply to the weighing of aggravators and mitigators because the jurors' determination of that issue is not one that involves fact-finding, but rather "[t]he weighing process is purely a judgmental one, of balancing the mitigator[s] against the aggravator[s] to determine whether death is the appropriate punishment in the particular case. This is a process that not only traditionally, but quintessentially is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt." 367 Md. at 126–27, 786 A.2d at 652.

The Supreme Court's decision in *Ring* necessarily alters our reasoning and conclusions in *Borchardt*, but only as to the first two of the three prongs upon which *Borchardt* rests. Ring does not, however, require that we reach a different outcome. In order to understand this result, it is necessary to understand the development of death penalty sentencing jurisprudence since *Furman*, developments which in turn influenced the development of the Maryland death penalty statute. It is only with an understanding of this history that the limited impact of *Ring* and how its holding fits within this framework can be understood. As will be seen, *infra*, when taken in the context of the Supreme Court's death penalty jurisprudence, *Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors. Of particular import is that jurisprudence which distinguishes those elements of the sentencing process which make a defendant death-eligible from those elements involved in selecting those death-eligible defendants who actually will be sentenced to death.

---

14. We reached a similar conclusion in *Blackwell*, involving the predecessor death penalty statute, noting that "[§ ] 413 does not create a new crime; it is simply a penalty statute for murder in the first degree, which authorized the imposition of one of two punishments for the offense-life imprisonment or death." 278 Md. at 473, 365 A.2d at 549.

■ Supreme Court jurisprudence in this area has forced states to adopt systems of sentencing which conform to the two lines of cases described by Justice Scalia in *Walton, supra.* These two lines of cases describe a sentencing process divided into two distinct phases, each with separate and distinct constitutional requirements. The first line of cases, running directly from *Furman,* addresses the first phase of the sentencing process, the determination of eligibility. With regards to the eligibility phase, the Court has made it clear that state statutes must function to limit the class of individuals who may be deemed death-eligible. This is usually accomplished by requiring the sentencing authority to find an aggravating factor. It is the finding of an aggravating factor which turns a convicted defendant into a death-eligible defendant.

The second line of cases addresses the second phase of the sentencing process, the selection phase. In this phase, the sentencing authority is allowed to identify and consider factors in mitigation and is allowed to elect to impose a sentence less than death if it views the circumstances as warranting a lesser punishment. While the Supreme Court repeatedly has stated that there are no constitutional requirements as to how the states must design the selection phase, other than that they may not curtail the sentencing authority's ability to consider factors in mitigation, the states generally have adopted one of two methods. In some states the sentencing authority, after determining the existence of at least one aggravating factor making the defendant death-eligible, is instructed to determine if there are mitigating factors which justify not imposing the death penalty. In other "weighing" states, like Maryland, the sentencing authority is instructed, after determining the existence of at least one aggravating factor making the defendant death-eligible, to weigh the mitigators against the aggravators.[15]

The distinction may seem, at first blush, to be predicated on semantics as in both scenarios the sentencing authority is

---

15. *See Zant v. Stephens,* 462 U.S. 862, 873–74 & n. 12, 103 S.Ct. 2733, 2741 & n. 12, 77 L.Ed.2d 235, 247–48 & n. 12 (1983) (noting that in a

comparing the relative weight of circumstances in mitigation to determine if mercy is appropriate, but the distinction between the two is real and critical to proper constitutional analysis. The reason is that, in "weighing" states, an appellate determination that one or more of the statutorily defined aggravating factors found in a given case fails to meet constitutional muster requires a re-weighing of the remaining aggravators and mitigators, as the impermissible aggravator potentially acted as a "thumb on the scales" during the original weighing.[16] Such a defect does not arise in a non-weighing state, where the defect may be resolved under a "harmless error" analysis. Regardless, under the Supreme Court's post-*Furman* jurisprudence, in both weighing and non-weighing schemes, it is the finding of an aggravating circumstance which makes the defendant death-eligible. The selection process that follows determines, under both weighing and non-weighing statutes, whether, in the judgment of the sentencing authority, the penalty actually should be applied.

## V.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court effectively approved the bifurcated system we employ in Maryland today. In *Gregg*, the Court reviewed Georgia's post-*Furman* death penalty statute. That statute [17] retained the death penalty for murder and five other

---

weighing state, "not only must the jury find at least one aggravating circumstance in order to have the power to impose the death sentence; in addition, the law requires the jury to weigh the aggravating circumstances against the mitigating circumstances when it decides whether or not the death penalty should be imposed").

**16.** *See Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Espinosa v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); *Sochor v. Florida*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992); *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

**17.** Ga.Code Ann. §§ 26–1101, 26–1311, 26–1902, 26–2001, 26–2201, 26–3301 (1972).

crimes. Guilt or innocence was determined in the first stage of a bifurcated trial. Upon a guilty verdict or plea, a pre-sentence hearing was held. At this hearing, the judge or jury would hear additional extenuating or mitigating evidence and evidence in aggravation of punishment. Under the statute, at least one of ten possible aggravating circumstances was required to be found to exist by the sentencing authority, whether judge or jury, beyond a reasonable doubt before the death sentence may be imposed. The defendant was required to be given pre-trial notice of the state's intention to prove specified aggravators. In addition, the jury was authorized to consider any other appropriate aggravating or mitigating circumstances. Where the jury was the sentencing authority, it was not required to find any mitigating circumstance in order to make a binding recommendation of mercy to the trial court, but it was required to find a *statutory* aggravating circumstance before recommending a sentence of death. The sentencing judge was bound by the recommended sentence of the jury. In its statutorily-required review of the death sentence, the Georgia Supreme Court was required to consider: (1) whether the sentence was influenced by passion, prejudice or any other arbitrary factor; (2) whether the evidence supported the finding of a statutory aggravating circumstance; and, (3) whether the death sentence was excessive or disproportionate to the penalty imposed in similar cases, considering both the particular crime and the particular defendant.

The Supreme Court in *Gregg* began its evaluation of the Georgia statute by reviewing the impact of *Furman*. The Court observed that:

> While *Furman* did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.... Indeed, the death sentences exam-

ined by the Court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.... [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.*, at 309–310[, 92 S.Ct. 2726] (STEWART, J., concurring).

*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We have long recognized that "[f]or the determination of sentences, justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender."

The cited studies assumed that the trial judge would be the sentencing authority. If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

Jury sentencing has been considered desirable in capital cases in order "to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' "

*Gregg,* 428 U.S. at 188–90, 96 S.Ct. at 2932–33, 49 L.Ed.2d at 883–84 (footnotes omitted and some internal citations omitted). Thus, in *Gregg* we see the beginnings of the Supreme Court's approval of the bifurcated sentencing procedure reflected in the current Maryland death penalty statutory scheme. In upholding the Georgia statute as constitutional, the Court noted the critical function of what would later become identified as the eligibility phase of the sentencing process, observing that:

> The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. *While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death.* In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here.

*Gregg,* 428 U.S. at 206–07, 96 S.Ct. at 2940–41, 49 L.Ed.2d at 893 (emphasis added). Thus, it is the finding of an aggravating factor which makes a defendant death-eligible, not that mitigating facts are weighed and found insufficient to justify mercy.

The Court reached a similar conclusion in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), decided

on the same day the Court decided *Gregg*. In *Proffitt*, the Court was reviewing Florida's post-*Furman* death penalty statute, a statute differing in many respects from the Georgia statute at issue in *Gregg*. Florida, unlike Georgia, implemented what would later be referred to as a "weighing" statute. The Court described the workings of the Florida statute as follows:

In response to *Furman v. Georgia*, 408 U.S. 238[, 92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), the Florida Legislature adopted new statutes that authorize the imposition of the death penalty on those convicted of first-degree murder. At the same time Florida adopted a new capital-sentencing procedure, patterned in large part on the Model Penal Code. Under the new statute, if a defendant is found guilty of a capital offense, a separate evidentiary hearing is held before the trial judge and jury to determine his sentence. Evidence may be presented on any matter the judge deems relevant to sentencing and must include matters relating to certain legislatively specified aggravating and mitigating circumstances. Both the prosecution and the defense may present argument on whether the death penalty shall be imposed.

At the conclusion of the hearing the jury is directed to consider "[w]hether sufficient mitigating circumstances exist ... which outweigh the aggravating circumstances found to exist; and ... [b]ased on these considerations, whether the defendant should be sentenced to life [imprisonment] or death." The jury's verdict is determined by majority vote. It is only advisory; the actual sentence is determined by the trial judge. The Florida Supreme Court has stated, however, that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ."

The trial judge is also directed to weigh the statutory aggravating and mitigating circumstances when he determines the sentence to be imposed on a defendant. The statute requires that if the trial court imposes a sentence of

death, "it shall set forth in writing its findings upon which the sentence of death is based as to the facts: (a) [t]hat sufficient [statutory] aggravating circumstances exist . . . and (b) [t]hat there are insufficient [statutory] mitigating circumstances . . . to outweigh the aggravating circumstances."

The statute provides for automatic review by the Supreme Court of Florida of all cases in which a death sentence has been imposed. The law differs from that of Georgia in that it does not require the court to conduct any specific form of review. Since, however, the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible, and the Supreme Court of Florida, like its Georgia counterpart, considers its function to be to "[guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great."

On their face these procedures, like those used in Georgia, appear to meet the constitutional deficiencies identified in *Furman*. The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant. He must, *inter alia*, consider whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant's role in the crime was that of a minor accomplice, and whether the defendant's youth argues in favor of a more lenient sentence than might otherwise be imposed. The trial judge must also determine whether the crime was committed in the course of one of several enumerated felonies, whether it was committed for

pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel. To answer these questions, which are not unlike those considered by a Georgia sentencing jury, see *Gregg v. Georgia, ante,* at 197[, 96 S.Ct. 2909], the sentencing judge must focus on the individual circumstances of each homicide and each defendant.

*The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, but it has never suggested that jury sentencing is constitutionally required.* And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

The Florida capital-sentencing procedures thus seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner. Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida "to determine independently whether the imposition of the ultimate penalty is warranted." The Supreme Court of Florida, like that of Georgia, has not hesitated to vacate a death sentence when it has determined that the sentence should not have been imposed. Indeed, it has vacated 8 of the 21 death sentences that it has reviewed to date.

Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sen-

tences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is " 'no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia, ante,* at 188[, 96 S.Ct. 2909], quoting *Furman v. Georgia,* 408 U.S., at 313[, 92 S.Ct. 2726] (WHITE, J., concurring). On its face the Florida system thus satisfies the constitutional deficiencies identified in *Furman.*

*Proffitt,* 428 U.S. at 247–253, 96 S.Ct. at 2964–67, 49 L.Ed.2d at 920–23 (emphasis added; some internal citations omitted; footnotes omitted).

In addressing the constitutionality of the weighing process in *Proffitt,* the Court observed:

In a similar vein the petitioner argues that it is not possible to make a rational determination whether there are "sufficient" aggravating circumstances that are not outweighed by the mitigating circumstances, since the state law assigns no specific weight to any of the various circumstances to be considered.

While these questions and decisions may be hard, they require no more line drawing than is commonly required of a fact-finder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against

the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

*Proffitt,* 428 U.S. at 257–58, 96 S.Ct. at 2969, 49 L.Ed.2d at 926 (citations omitted).

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), another case decided at the same time as *Gregg,* the Supreme Court struck down North Carolina's statutory response to *Furman.* North Carolina had chosen to eliminate the defects of arbitrariness in its pre-*Furman* death penalty statute by making the death penalty mandatory for all persons convicted of first degree murder. Obviously, such a system required that the sentencing authority, knowing that the penalty would be death, find that the defendant in question was guilty beyond a reasonable doubt. In rejecting such a mandatory sentencing scheme, the Court observed:

A separate deficiency of North Carolina's mandatory death sentence statute is its failure to provide a constitutionally tolerable response to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences. Central to the limited holding in *Furman* was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments. It is argued that North Carolina has remedied the inadequacies of the death penalty statutes held unconstitutional in *Furman* by withdrawing all sentencing discretion from juries in capital cases. But when one considers the long and consistent American experience with the death penalty in first-degree murder cases, it becomes evident that mandatory statutes enacted in response to *Furman* have simply papered over the problem of unguided and unchecked jury discretion. . . .

North Carolina's mandatory death penalty statute provides no standards to guide the jury in its inevitable exercise of the power to determine which first-degree murderers shall live and which shall die. And there is no way under

the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power through a review of death sentences. Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly. While a mandatory death penalty statute may reasonably be expected to increase the number of persons sentenced to death, it does not fulfill *Furman's* basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.

*Woodson,* 428 U.S. at 302–03, 96 S.Ct. at 2990–91, 49 L.Ed.2d at 959–60 (citations omitted).

The above cases firmly established the requirements of the eligibility phase of the sentencing process. It is not the mere fact of conviction which makes a defendant death-eligible, but rather the finding of an aggravating factor. The Court's jurisprudence on this point makes it clear that states must specify aggravating factors in order to direct and limit the sentencing authority's discretion as to the class of convicted defendants to which the death penalty may apply. Only when an aggravating circumstance is found beyond a reasonable doubt may a defendant be deemed death-eligible.

The Court, however, took a different tack when dealing with circumstances which might mitigate the actual imposition of the death penalty upon a death-eligible defendant. In both *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court reversed death sentences because either the statute (*Lockett*) or the judge (*Eddings*) impermissibly limited consideration of mitigating factors. With regard to the actual imposition of the death penalty, the Court, in *Eddings,* observed that the states were free to assign whatever weight to the mitigating circumstances they felt were appropriate, stating:

We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett.* Just as the State may not by statute ·preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Eddings,* 455 U.S. at 113–15, 102 S.Ct. at 876–77, 71 L.Ed.2d at 10–11 (footnotes omitted).

In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court again addressed the constitutionality of the Georgia death statute it previously upheld in *Gregg.* The issue before the Court in *Zant* was whether, an a non-weighing state, a death sentence could survive where one of the aggravating factors upon which it was based subsequently was found to be invalid. The Court upheld the sentence, reasoning that the invalidation of one of several aggravating factors did not require reversal where the purpose of the jury's finding of such circumstances was to limit the discretion in imposing the death penalty, and where state appellate review was designed to ensure that a death penalty would be set aside if it were arbitrary or capricious. The Court left open the question of whether the subsequent invalidation of a factor would have the same result in a weighing state, such as Maryland, stating:

Finally, we note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is "invalid" under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty. As we have discussed, the Constitution does not require a State to adopt specific

standards for instructing the jury in its consideration of aggravating and mitigating circumstances, and Georgia has not adopted such a system.

*Zant,* 462 U.S. at 890, 103 S.Ct. at 2750, 77 L.Ed.2d at 258 (some internal citations omitted). Nevertheless, as the above language makes plain, the Court's analysis in *Zant* of the respective roles of aggravating and mitigating circumstances in the sentencing process is relevant to weighing states as well.

In analogizing the sentencing process, the Court in *Zant* noted with approval responses from the Georgia Supreme Court to a certified question, observing that:

In its response to our certified question, the Georgia Supreme Court ... explained the state-law premises for its treatment of aggravating circumstances by analogizing the entire body of Georgia law governing homicides to a pyramid. It explained:

All cases of homicide of every category are contained within the pyramid. The consequences flowing to the perpetrator increase in severity as the cases proceed from the base to the apex, with the death penalty applying only to those few cases which are contained in the space just beneath the apex. To reach that category a case must pass through three planes of division between the base and the apex.

The first plane of division above the base separates from all homicide cases those which fall into the category of murder. This plane is established by the legislature in statutes defining terms such as murder, voluntary manslaughter, involuntary manslaughter, and justifiable homicide. In deciding whether a given case falls above or below this plane, the function of the trier of facts is limited to finding facts. The plane remains fixed unless moved by legislative act.

The second plane separates from all murder cases those in which the penalty of death is a possible punishment. This plane is established by statutory definitions of aggrava-

ting circumstances. The function of the factfinder is again limited to making a determination of whether certain facts have been established. Except where there is treason or aircraft hijacking, a given case may not move above this second plane unless at least one statutory aggravating circumstance exists.

The third plane separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed. There is an absolute discretion in the factfinder to place any given case below the plane and not impose death. The plane itself is established by the factfinder. In establishing the plane, the factfinder considers all evidence in extenuation, mitigation and aggravation of punishment. There is a final limitation on the imposition of the death penalty resting in the automatic appeal procedure: This court determines whether the penalty of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the statutory aggravating circumstances are supported by the evidence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. Performance of this function may cause this court to remove a case from the death penalty category but can never have the opposite result.

The purpose of the statutory aggravating circumstances is to limit to a large degree, but not completely, the factfinder's discretion. Unless at least one of the ten statutory aggravating circumstances exists, the death penalty may not be imposed in any event. If there exists at least one statutory aggravating circumstance, the death penalty may be imposed but the factfinder has a discretion to decline to do so without giving any reason. In making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense and the defendant.

A case may not pass the second plane into that area in which the death penalty is authorized unless at least one

statutory aggravating circumstance is found. However, this plane is passed regardless of the number of statutory aggravating circumstances found, so long as there is at least one. Once beyond this plane, the case enters the area of the factfinder's discretion, in which all the facts and circumstances of the case determine, in terms of our metaphor, whether or not the case passes the third plane and into the area in which the death penalty is imposed.

*Zant*, 462 U.S. at 870–72, 103 S.Ct. at 2739–40, 77 L.Ed.2d at 245–47 (internal citations omitted).

The Court in *Zant* next turned its attention to the sentencing process set forth in the Georgia statute, finding it to be constitutional. In doing so, the Court specifically pointed out that it is not constitutionally required that there be specific standards for balancing aggravating circumstances against mitigating circumstances in a sentencing statute. The Court stated:

In Georgia, unlike some other States, the jury is not instructed to give any special weight to any aggravating circumstance, to consider multiple aggravating circumstances any more significant than a single such circumstance, or to balance aggravating against mitigating circumstances pursuant to any special standard. Thus, in Georgia, the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty. For this reason, respondent argues that Georgia's statutory scheme is invalid under the holding in *Furman v. Georgia.*

\* \* \* \* \*

Respondent argues that the mandate of *Furman* is violated by a scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by

statute. But that argument could not be accepted without overruling our specific holding in *Gregg*. For the Court approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances.

*Zant,* 462 U.S. at 873–75, 103 S.Ct. at 2741–42, 77 L.Ed.2d at 247–49.

In a corresponding footnote, the Court further explained:

The joint opinion [in *Gregg* ] specifically described the Georgia scheme in these terms:

"Georgia did act, however, to narrow the class of murderers subject to capital punishment by specifying 10 statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can. ever be imposed. In addition, the jury is authorized to consider any other appropriate aggravating or mitigating circumstances. The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, but it must find a *statutory* aggravating circumstance before recommending a sentence of death."

The joint opinion issued the same day in *Jurek v. Texas,* 428 U.S. 262[, 96 S.Ct. 2950, 49 L.Ed.2d 929] (1976), makes clear that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required. In *Jurek* we held that the State's action in "narrowing the categories of murders for which a death sentence may ever be imposed" served much the same purpose as the lists of statutory aggravating circumstances that Georgia and Florida had adopted. We also held that one of the three questions presented to the sentencing jury permitted the defendant to bring mitigating circumstances to the jury's attention. Thus, in Texas, aggravating and mitigating circumstances were not considered at the same stage of the criminal prosecution and certainly were not explicitly balanced against each other.

*Zant,* 462 U.S. at 875 n. 13, 103 S.Ct. at 2742 n. 13, 77 L.Ed.2d at 249 n. 13 (some internal citations omitted). The Court also explained the distinction between weighing states, such as Maryland, and non-weighing states, such as Georgia, noting the separate, but dual, function of aggravating factors in a weighing state. The Court further illustrated, citing four state cases from weighing states, why the holdings in the cases from the weighing states would not be applicable to the situation where an aggravating factor subsequently was found to be invalid under a non-weighing statute. The Court stated:

> In each of these cases, the State Supreme Court set aside a death sentence based on both valid and invalid aggravating circumstances. Respondent advances these cases in support of his contention that a similar result is required here. However, examination of the relevant state statutes shows that in each of these States, not only must the jury find at least one aggravating circumstance [in the eligibility phase] *in order to have the power to impose the death sentence;* in addition, the law requires the jury to weigh the aggravating circumstances against the mitigating circumstances when it decides whether or not the death penalty should be imposed [the selection phase].

*Zant,* 462 U.S. at 873 n. 12, 103 S.Ct. at 2741 n. 12, 77 L.Ed.2d at 247 n. 12 (emphasis added; internal citations omitted).[18]

The Court concluded its discussion of the roles of aggravating and mitigating circumstances, and the weighing process, by reaffirming its prior holdings that it is the finding of an aggravating circumstance, and not the weighing process, which makes a defendant eligible for the death penalty, noting that:

> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the

---

**18.** As will be seen, *infra,* the Court later would explain that, in a weighing state, the inclusion of an invalid circumstance in the weighing process can act as a "thumb on the scale" of the sentencing authorities deliberations as to whether to impose the death penalty during the selection phase. See *supra,* note 16.

stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime. See *Eddings v. Oklahoma*, 455 U.S. 104, 110–112[, 102 S.Ct. 869, 71 L.Ed.2d 1] (1982); *Lockett v. Ohio*, 438 U.S. 586, 601–605[, 98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) (plurality opinion); *Roberts (Harry) v. Louisiana*, 431 U.S. 633, 636–637[, 97 S.Ct. 1993, 52 L.Ed.2d 637] (1977); *Gregg*, 428 U.S., at 197[, 96 S.Ct. 2909] (opinion of Stewart, POWELL, and STEVENS, JJ.); *Proffitt v. Florida*, 428 U.S., at 251–252[, 96 S.Ct. 2960] (opinion of Stewart, POWELL, and STEVENS, JJ.); *Woodson v. North Carolina*, 428 U.S. 280, 303–304[, 96 S.Ct. 2978, 49 L.Ed.2d 944] (1976) (plurality opinion).

*Zant*, 462 U.S. at 878–79, 103 S.Ct. at 2743–44, 77 L.Ed.2d at 250–51.[19]

---

**19.** The distinction between the eligibility phase and the selection phase was reiterated in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255, (1990), involving a weighing statute. The Pennsylvania death penalty statute provided that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa. Cons.Stat. § 9711(c)(1)(iv)(1988). Blystone argued that the death penalty statute was unconstitutional because it mandated a sentence of death based on the outcome of the weighing process. The Court summarily rejected this argument, noting:

The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by a jury. *See Lowenfield v. Phelps*, 484 U.S. 231, 244[, 108 S.Ct. 546, 98 L.Ed.2d 568] (1988) ("The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion"). The requirement of individualized

In *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134, (1983) (plurality opinion), the Supreme Court considered a situation where the sentencing authority imposed a death sentence on the basis of several aggravating factors, one of which, while constitutionally permissible, was impermissible under the state statute. In reviewing the requirements of the Florida statute and case law in question, the Court observed:

> The Florida statute, like the Georgia statute at issue in *Zant v. Stephens*, 462 U.S. 862[, 103 S.Ct. 2733, 77 L.Ed.2d 235] (1983), requires the sentencer to find at least one valid statutory aggravating circumstances before the death penalty may even be considered, and permits the trial court to admit any evidence that may be relevant to the proper sentence. Unlike the Georgia statute, however, Florida law requires the sentencer to balance statutory aggravating circumstances against all mitigating circumstances and does not permit nonstatutory aggravating circumstances to enter into this weighing process. The statute does not establish any special standard for this weighing process.

Although the Florida statute did not change significantly between *Proffitt* and the decision below, the Florida Supreme Court has developed a body of case law in this area. One question that has arisen is whether defendants must be resentenced when trial courts erroneously consider improper aggravating factors. If the trial court found that some mitigating circumstances exist, the case will generally be remanded for resentencing. If the trial court properly found that there are no mitigating circumstances, the Florida Supreme Court applies a harmless-error analysis. In such a case, "a reversal of the death sentence would not necessarily be required," because the error might be harmless.

---

sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.
494 U.S. at 306–07, 110 S.Ct. at 1083, 108 L.Ed.2d at 264.

*Barclay,* 463 U.S. at 954–55, 103 S.Ct. at 3427, 77 L.Ed.2d at 1146–47 (some internal citations omitted; footnotes omitted). Because the error was one of state law, the factor involved was but one of several found to exist, and no mitigating circumstances were present, the Court upheld the judgment of the Florida Supreme Court in finding the error to be harmless. In so doing, the Court commented on the nature of the selection phase of the sentencing process, distinguishing it in much the same terms we used to support our third rationale in *Borchardt.* (*See infra* at 257–60). The Court observed:

Any sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences. The thrust of our decisions on capital punishment has been that " 'discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' " *Zant v. Stephens,* 462 U.S. 862, 874[, 103 S.Ct. 2733, 77 L.Ed.2d 235] (1983), quoting *Gregg v. Georgia,* 428 U.S. 153, 189[, 96 S.Ct. 2909, 49 L.Ed.2d 859] (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). This very day we said in another capital case:

"In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar 'central issue' from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, *as did respondent's jury in determining the truth of the alleged special circumstance,* the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos,* [463 U.S. 992,] 1008, [103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171, 1185] (1983).

We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sen-

tencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing. We expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that discretion is guided in a constitutionally adequate way, *see Proffitt v. Florida,* 428 U.S. 242[, 96 S.Ct. 2960, 49 L.Ed.2d 913] (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more.

*Barclay,* 463 U.S. at 950–51, 103 S.Ct. at 3425, 77 L.Ed.2d at 1144 (emphasis added).[20]

The next case of importance, leading into our specific consideration of the Maryland statutory framework, is *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).[21] In *Clemons,* the Court confronted the issue which it

---

**20.** *See also Penry v. Lynaugh,* 492 U.S. 302, 327–28, 109 S.Ct. 2934, 2951–52, 106 L.Ed.2d 256, 284 (1989):

"In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp,* 481 U.S. 279, 304[, 107 S.Ct. 1756, 95 L.Ed.2d 262] (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.' " *Franklin,* 487 U.S., at 184 [108 S.Ct. 2320] (O'Connor, J., concurring in judgment) (quoting *California v. Brown,* 479 U.S., at 545 [107 S.Ct. 837] (O'Connor, J., concurring)). In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson,* 428 U.S., at 305 [96 S.Ct. 2978], the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime. (emphasis added).

**21.** Decided approximately three months prior to *Walton v. Arizona.*

left open in *Zant,* namely, whether, in a weighing state, such as Maryland, reversal was required where one of several aggravating factors was found on direct appeal to be constitutionally invalid. In *Clemons,* the Mississippi Supreme Court determined that the error was harmless, and held that upon re-weighing by it of the remaining factors, the death penalty was appropriate.[22] Because one of the aggravating factors remained intact after appellate scrutiny, the question of whether Mr. Clemons was death eligible was not before the Court; only questions concerning the selection phase of the sentencing process were at issue. Clemons argued that the Mississippi Supreme Court, in finding that a jury would have found death appropriate even without the presence of the invalid aggravating factor, improperly applied the harmless-error rule. He also argued that he had a liberty interest in having a jury make all the determinations relevant to his sentence, and that an appellate court could not reweigh the balance of factors. The U.S. Supreme Court disagreed with Clemons on both issues,[23] observing that:

> Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury, function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless. As the plurality in *Barclay v. Florida, supra,* opined, the Florida Supreme Court could apply harmless-error analysis when reviewing a death sentence imposed by a trial judge who relied on an aggravating circumstance not available for his consideration under Florida law:
>
> > "Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-

---

**22.** Mississippi Code Ann. § 99–19–101(3)(c) (Supp.1989) provides that "[f]or the jury to impose a sentence of death, it must unanimously find ... (c) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances."

**23.** Nevertheless, because the record was unclear as to whether the state Supreme Court actually conducted a reweighing, the sentence was vacated.

error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.... 'What is important ... is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.' *Zant,* [462 U.S.], at 879[, 103 S.Ct. 2733] (emphasis in original)." *Id.,* at 958[, 103 S.Ct. 3418].

\* \* \* \* \*

Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless-error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible. In some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless-error analysis extremely speculative or impossible. We have previously noted that appellate courts may face certain difficulties in determining sentencing questions in the first instance. Nevertheless, that decision is for state appellate courts, including the Mississippi Supreme Court in this case, to make.

*Clemons,* 494 U.S. at 752–54, 110 S.Ct. at 1450–51, 108 L.Ed.2d at 741–42 (footnotes omitted; some internal citations omitted).

In holding that the reweighing of aggravating factors against mitigating factors did not offend the federal Constitution, the Court observed:

In *Zant v. Stephens,* 462 U.S. 862[, 103 S.Ct. 2733, 77 L.Ed.2d 235] (1983), we determined that in a State like Georgia, where aggravating circumstances serve only to make a defendant eligible for the death penalty and not to

determine the punishment, the invalidation of one aggravating circumstance does not necessarily require an appellate court to vacate a death sentence and remand to a jury. We withheld opinion, however, "concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty." *Id.* at 890[, 103 S.Ct. 2733]. In Mississippi, unlike the Georgia scheme considered in *Zant*, the finding of aggravating factors is [also] part of the jury's sentencing determination, and the jury is required to weigh any mitigating factors against the aggravating circumstances. Although these differences complicate the questions raised, we do not believe that they dictate reversal in this case.

Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that the one or more valid remaining aggravating factors outweigh the mitigating evidence. Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court. *Cabana v. Bullock*, 474 U.S. 376[, 106 S.Ct. 689, 88 L.Ed.2d 704] (1986), held that an appellate court can make the findings required by *Enmund v. Florida*, 458 U.S. 782[, 102 S.Ct. 3368, 73 L.Ed.2d 1140] (1982), in the first instance and stated that "[the decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury.]" 474 U.S. at 385[, 106 S.Ct. 689]. *Spaziano v. Florida*, 468 U.S. 447[, 104 S.Ct. 3154, 82 L.Ed.2d 340] (1984), ruled that neither the Sixth Amendment, nor the Eighth Amendment, nor any other constitutional provision provides a defendant with the right to have

a jury determine the appropriateness of a capital sentence; neither is there a double jeopardy prohibition on a judge's override of a jury's recommended sentence. Likewise, the Sixth Amendment does not require that a jury specify the aggravating factors that permit the imposition of capital punishment, *Hildwin v. Florida,* 490 U.S. 638[, 109 S.Ct. 2055, 104 L.Ed.2d 728] (1989), nor does it require jury sentencing, even where the sentence turns on specific findings of fact. *McMillan v. Pennsylvania,* 477 U.S. 79, 93[, 106 S.Ct. 2411, 91 L.Ed.2d 67] (1986).

To avoid the import of these cases, Clemons argues that under Mississippi law only a jury has the authority to impose a death sentence, and that he therefore has a liberty interest under the Due Process Clause of the Fourteenth Amendment in having a jury make all determinations relevant to his sentence. He therefore argues that an appellate court cannot reweigh the balance of factors when the jury has found and relied on an invalid aggravating circumstance. Capital sentencing proceedings must of course satisfy the dictates of the Due Process Clause, and we have recognized that when state law creates for a defendant a liberty interest in having a jury make particular findings, speculative appellate findings will not suffice to protect that entitlement for due process purposes. However, these two general propositions do not lead to the result Clemons seeks.

In *Hicks v. Oklahoma,* [447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) ] sentence had been imposed under an invalid recidivist statute that provided for a mandatory 40-year sentence. The Oklahoma Court of Criminal Appeals affirmed the sentence because it was within the range of possible sentences the jury validly could have imposed. Hicks claimed, and the State conceded, that in Oklahoma only the jury could impose sentence. We held that under state law Hicks had a liberty interest in having the jury impose punishment, an interest that could not be overcome by the "frail conjecture" that the jury "might" have imposed the same sentence in the absence of the recidivist statute. We specifically pointed out, however, that the Oklahoma

Court of Criminal Appeals did not "purport to cure the deprivation by itself reconsidering the appropriateness" of the 40–year sentence, thus suggesting that appellate sentencing, if properly conducted, would not violate due process of law.

Contrary to the situation in *Hicks,* the state court in this case, as it had in others, asserted its authority under Mississippi law to decide for itself whether the death sentence was to be affirmed even though one of the two aggravating circumstances on which the jury had relied should not have been, or was improperly, presented to the jury. The court did not consider itself bound in such circumstances to vacate the death sentence and to remand for a new sentencing proceeding before a jury. We have no basis for disputing this interpretation of state law, which was considered by the court below to be distinct from its asserted authority to affirm the sentence on the ground of harmless error, and which plainly means that we must reject Clemons' assertion that he had an unqualified liberty interest under the Due Process Clause to have the jury assess the consequence of the invalidation of one of the aggravating circumstances on which it had been instructed. In this respect, the case is analogous to *Cabana v. Bullock, supra,* where we specifically rejected a due process challenge based on *Hicks* because state law created no entitlement to have a jury make findings that an appellate court also could make.

Clemons also submits that appellate courts are unable to fully consider and give effect to the mitigating evidence presented by defendants at the sentencing phase in a capital case and that it therefore violates the Eighth Amendment for an appellate court to undertake to reweigh aggravating and mitigating circumstances in an attempt to salvage the death sentence imposed by a jury. He insists, therefore, that he is entitled to a new sentencing hearing before a jury and that the decision below must be reversed. We are unpersuaded, however, that our cases require this result. Indeed, they point in the opposite direction.

The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime. In scrutinizing death penalty procedures under the Eighth Amendment, the Court has emphasized the "twin objectives" of "measured consistent application and fairness to the accused." Nothing inherent in the process of appellate reweighing is inconsistent with the pursuit of the foregoing objectives.

We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant. It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed. And, as the opinion below indicates, a similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review. Furthermore, this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency. It is also important to note that state supreme courts in States authorizing the death penalty may well review many death sentences and that typical jurors, in contrast, will serve on only one such case during their lifetimes. Therefore, we conclude that state appellate courts can and do give each defendant an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime.

This is surely the import of *Cabana v. Bullock*, 474 U.S. 376[, 106 S.Ct. 689, 88 L.Ed.2d 704] (1986), which held that a state appellate court could make the finding that *Enmund v. Florida*, 458 U.S. 782[, 102 S.Ct. 3368, 73 L.Ed.2d 1140] (1982), required for the imposition of the death penalty, *i.e.* whether the defendant had killed, attempted to kill, or intended to kill. *Wainwright v. Goode*, 464 U.S. 78[, 104 S.Ct. 378, 78 L.Ed.2d 187] (1983) *(per curiam)*, is likewise

instructive. There, a Florida trial judge relied on an allegedly impermissible aggravating circumstance ("future dangerousness") in imposing a death sentence on Goode. The Florida Supreme Court conducted an independent review of the record, reweighed the mitigating and aggravating factors, and concluded that the death penalty was warranted. In a federal habeas proceeding, Goode then successfully challenged the trial court's reliance on the allegedly impermissible factor. We reversed the grant of the writ and concluded that even if the trial judge relied on a factor not available for his consideration under Florida law, the sentence could stand. "Whatever may have been true of the sentencing judge, there is no claim that in conducting its independent reweighing of the aggravating and mitigating circumstances the Florida Supreme Court considered Goode's future dangerousness. Consequently there is no sound basis for concluding that the procedures followed by the State produced an arbitrary or freakish sentence forbidden by the Eighth Amendment."

We accordingly see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence. Nor are we impressed with the claim that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role. In *Spaziano* and *Proffitt*, we upheld the Florida death penalty scheme permitting a trial judge to override a jury's recommendation of life even though there were no written jury findings. An appellate court also is able adequately to evaluate any evidence relating to mitigating factors without the assistance of written jury findings. *Clemons,* 494 U.S. at 744–50, 110 S.Ct. at 1446–1449, 108 L.Ed.2d at 735–739 (some internal citations omitted; footnotes omitted).[24]

---

24. *See also, Parker v. Florida Dept. of Corrections*, 498 U.S. 308, 318–19, 111 S.Ct. 731, 738, 112 L.Ed.2d 812, 824 (1991) ("As noted, Florida is a

The next important case, *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), is of particular importance to our discussion, as specific portions (and only specific portions) of its holding were overruled by *Ring.* In *Walton,* the defendant was found guilty in an Arizona trial court of first-degree murder and was sentenced in a separate sentencing hearing before the judge, as required by state law. The Arizona statutes provided that:

> [a] person commits first-degree murder if "intending or knowing that his conduct will cause death, such person causes the death of another with premeditation" or if in the course of committing certain specified offenses and without any mental state other than what is required for the commission of such offenses, he causes the death of any person. After a person has been found guilty of first-degree murder, the sentence for such crime is determined in accordance with the provisions of § 13–703(B). It is there directed that a "separate sentencing hearing ... shall be conducted before the court alone" to determine whether the sentence shall be death or life imprisonment. In the course of such hearing, the judge is instructed to determine the existence or nonexistence of any of the aggravating or mitigating circumstances defined in subsections (F) and (G) of § 13–703. Subsection (F) defines 10 aggravating circumstances that may be considered. One of them is whether the offense was committed with the expectation of receiving anything of pecuniary value. Another is whether the defendant committed the offense in an especially heinous, cruel, or depraved manner. Subsection (G) defines mitigating circumstances as any factors "which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to" five specified factors. The burden of establishing the existence of any of the aggrava-

---

weighing State; the death penalty may be imposed only where specified aggravating circumstances outweigh all mitigating circumstances.").

ting circumstances is on the prosecution, while the burden of establishing mitigating circumstances is on the defendant. The court is directed to return a special verdict setting forth its findings as to aggravating and mitigating circumstances and then "shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection (F) of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency."

*Walton,* 497 U.S. at 642–44, 110 S.Ct. at 3051–52, 111 L.Ed.2d at 521–22 (some internal citations omitted).

Walton's primary argument was that his Sixth Amendment rights were violated by the framework of the Arizona statute, in that it allowed a judge, rather than a jury, to determine that the defendant killed, attempted to kill, or intended to kill,[25] and to find the existence of aggravating factors. Walton argued that these determinations were exclusively jury functions. The Court rejected Walton's argument, observing:

Walton's first argument is that every finding of fact underlying the sentencing decision must be made by a jury, not by a judge, and that the Arizona scheme would be constitutional only if a jury decides what aggravating and mitigating circumstances are present in a given case and the trial judge then imposes sentence based on those findings. Contrary to Walton's assertion, however: "Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." *Clemons v. Mississippi,* 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

We repeatedly have rejected constitutional challenges to Florida's death sentencing scheme, which provides for sentencing by the judge, not the jury. *Hildwin v. Florida,* 490

---

**25.** *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (a defendant who was found guilty of felony murder could not be executed for taking part in a robbery where he never intended that deadly force be used).

U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) *(per curiam); Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Hildwin,* for example, we stated that "this case presents us once again with the question whether the Sixth Amendment requires a jury to specify the aggravating factors that permit the imposition of capital punishment in Florida," and we ultimately concluded that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."

The distinctions Walton attempts to draw between the Florida and Arizona statutory schemes are not persuasive. It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.

Walton also suggests that in Florida aggravating factors are only sentencing "considerations" while in Arizona they are "elements of the offense." But as we observed in *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), an Arizona capital punishment case: Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (*i.e.,* require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (*i.e.,* preclude the death penalty)."

Our holding in *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), provides further support for our conclusion. *Cabana* held that an appellate court could constitutionally make the *Enmund v. Florida,* 458 U.S. 782,

102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), finding—that the defendant killed, attempted to kill, or intended to kill—in the first instance. We noted that "*Enmund,* 'does not affect the state's definition of any substantive offense, even a capital offense,'" 474 U.S. at 385[, 106 S.Ct. 689] (citations omitted), and that "while the Eighth Amendment prohibits the execution of such defendants, it does not supply a new element of the crime of capital murder that must be found by the jury." *Enmund* only places "a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." If the Constitution does not require that the *Enmund* finding be proved as an element of the offense of capital murder, and does not require a jury to make that finding, we cannot conclude that a State is required to denominate aggravating circumstances "elements" of the offense or permit only a jury to determine the existence of such circumstances.

*Walton,* 497 U.S. at 647–49, 110 S.Ct. at 3054–55, 111 L.Ed.2d at 524–25 (some internal citations omitted). This holding was reversed in part by *Ring,* but only to the extent that *Walton* held that the Constitution did not require aggravating factors to be found by a jury. Employing multiple understatement, the Court in *Ring* stated:

Although " 'the doctrine of stare decisis is of fundamental importance to the rule of law[,]' . . . our precedents are not sacrosanct." "We have overruled prior decisions where the necessity and propriety of doing so has been established." We are satisfied that this is such a case.

For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* **to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance** necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi,* 530 U.S. at 494[, 120 S.Ct. 2348], the Sixth Amendment requires that they be found by a jury.

*Ring,* 536 U.S. at 608–09, 122 S.Ct. at 2442–43, 153 L.Ed.2d at 576–77 (emphasis added; some internal citations omitted).

By the mid 1990's, the Supreme Court's post-*Furman* death penalty jurisprudence reached a point of maturity and relative stability. In *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Court reviewed its handiwork and explained and affirmed the distinctions it had developed between the eligibility phase and the selection phase of the death sentence apparatus. The Court stated:

Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision. To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a *defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase.* See, *e.g., Lowenfield v. Phelps,* 484 U.S. 231, 244–246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. See *Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague. *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); see *Arave, supra,* at 471[, 113 S.Ct. 1534] (court " 'must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer' ") (quoting

*Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)).

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant, supra,* at 879[, 103 S.Ct. 2733]; see also *Woodson v. North Carolina,* 428 U.S. 280, 303–304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) ("requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence").

The eligibility decision fits the crime within a defined classification. Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to "make rationally reviewable the process for imposing a sentence of death." The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability. The objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time. There is one principle common to both decisions, however: The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision. See *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (procedures must "minimize the risk of wholly arbitrary and capricious action"). That is the controlling objective when we examine eligibility and selection factors for vagueness. Indeed, it is the reason that eligibility and selection factors (at least in

some sentencing schemes) may not be "too vague." *Walton, supra,* at 654[, 110 S.Ct. 3047].

*Tuilaepa,* 512 U.S. at 971–73, 114 S.Ct. at 2634–35, 129 L.Ed.2d at 759–60 (emphasis added; some internal citations omitted).

Defendant Tuilaepa had argued, among other things, that the California statute was unconstitutional because it did not require selection factors to meet the same requirements as eligibility factors and did not sufficiently instruct the sentencer as to how to weigh the factors in arriving at an appropriate sentence. The Court rejected both of these arguments, and with regard to weighing stated:

A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. In *California v. Ramos,* for example, we upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." 463 U.S. at 1008–1009, n. 22[, 103 S.Ct. 3446]. Likewise, in *Proffitt v. Florida,* we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." 428 U.S. at 258[, 96 S.Ct. 2960]. In *Gregg,* moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." *Zant,* 462 U.S. at 875[, 103 S.Ct. 2733]. We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. 428 U.S. at 203–204[, 96 S.Ct. 2909]. In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to

determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant, supra,* at 875[, 103 S.Ct. 2733]; see also *Barclay v. Florida,* 463 U.S. 939, 948–951, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (plurality opinion). In contravention of those cases, petitioners' argument would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors. The States are not required to conduct the capital sentencing process in that fashion. *See Gregg,* 428 U.S. at 199–200, n. 50[, 96 S.Ct. 2909].

*Tuilaepa,* 512 U.S. at 979–80, 114 S.Ct. at 2638–39, 129 L.Ed.2d at 764–65 (some internal citations omitted).

The Court reiterated the point in its decision in *Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), stating:

*We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."* Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer. To require that "great weight" be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micromanagement tasks that properly rest within the State's discretion to administer its criminal justice system.

*Harris,* 513 U.S. at 512, 115 S.Ct. at 1035–36, 130 L.Ed.2d at 1014 (emphasis added; some internal citations omitted).

And finally, in *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Court explained:

Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. However, the State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evi-

dence. Thus, in *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. See *Tuilaepa, supra,* at 978–979[, 114 S.Ct. 2630] (noting that at the selection phase, the State is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens, supra,* at 875[, 103 S.Ct. 2733] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg, supra* ).

*Buchanan,* 522 U.S. at 275–77, 118 S.Ct. at 761–62, 139 L.Ed.2d at 709–10 (some internal citations omitted).

## VI.

■ We now come to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the case whose proper application is at issue in the present case. It is in *Ring* that the Supreme Court's Eighth Amendment death penalty jurisprudence meets its Sixth Amendment jurisprudence on the subject. In *Ring,* the defendant raised an *Apprendi* challenge to his death sentence, arguing that the Arizona death penalty statute violated his Sixth Amendment right to have all findings exposing him to the maximum penalty made by a jury according to the beyond a reasonable doubt standard. Specifically, Ring argued that Arizona's capital sentencing scheme violated the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of an aggravating factor, *see Walton, supra,*

thus raising the defendant's maximum penalty to death. Arizona argued that the Court previously upheld its death penalty scheme in *Walton*, and had stated in *Apprendi* that its decision in that case did not implicate its *Walton* holding. The Court in *Ring* overruled *Walton* "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty." 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77.

The Court described the workings of the Arizona death penalty statute as follows:

> Under Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made. The State's first-degree murder statute prescribes that the offense "is punishable by death or life imprisonment as provided by § 13–703." The cross-referenced section, § 13–703, directs the judge who presided at trial to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances ... for the purpose of determining the sentence to be imposed." The statute further instructs: "The hearing shall be conducted before the court alone. The court alone shall make all factual determinations required by this section or the constitution of the United States or this state."
>
> At the conclusion of the sentencing hearing, the judge is to determine the presence or absence of the enumerated "aggravating circumstances" and any "mitigating circumstances." The State's law authorizes the judge to sentence the defendant to death only if there is at least one aggravating circumstance and "there are no mitigating circumstances sufficiently substantial to call for leniency."

*Ring*, 536 U.S. at 592, 122 S.Ct. at 2434–35, 153 L.Ed.2d at 566 (footnotes omitted; some internal citations omitted). Having described the workings of the Arizona death statute, the Court observed:

> Based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he

could have received was life imprisonment. The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury.

*Ring,* 536 U.S. at 597, 122 S.Ct. at 2437, 153 L.Ed.2d at 569 (footnote and internal citation omitted). As the Court pointed out, Ring's claim was tightly delineated:

He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See *Apprendi v. New Jersey,* 530 U.S. 466, 490–491, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). *Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty.* See *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (*"It has never [been] suggested that jury sentencing is constitutionally required."*). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See *Clemons v. Mississippi,* 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See *Apprendi,* 530 U.S. at 477, n. 3[, 120 S.Ct. 2348] (Fourteenth Amendment "has not ... been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' ").

*Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4, 153 L.Ed.2d at 569 n. 4 (emphasis added).

The Court next addressed the impact of the application of its holding in *Apprendi* upon the Arizona death penalty statute. The Court explained:

> The defendant-petitioner in [*Apprendi* ] was convicted of, *inter alia,* second-degree possession of a firearm, an offense carrying a maximum penalty of ten years under New Jersey law. See *id.,* at 469–470[, 120 S.Ct. 2348]. On the prosecutor's motion, the sentencing judge found by a preponderance of the evidence that Apprendi's crime had been motivated by racial animus. That finding triggered application of New Jersey's "hate crime enhancement," which doubled Apprendi's maximum authorized sentence. The judge sentenced Apprendi to 12 years in prison, 2 years over the maximum that would have applied but for the enhancement.
>
> We held that Apprendi's sentence violated his right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." That right attached not only to Apprendi's weapons offense *but also to the "hate crime" aggravating circumstance.* New Jersey, the Court observed, "threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race." "Merely using the label 'sentence enhancement' to describe the [second act] surely does not provide a principled basis for treating [the two acts] differently."
>
> The dispositive question, we said, "is one not of form, but of effect." If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. A defendant may not be "exposed ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." "All the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury."

*Walton* could be reconciled with *Apprendi,* the Court finally asserted. The key distinction, according to the *Apprendi* Court, was that a conviction of first-degree murder in Arizona carried a maximum "sentence of death." Once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.

The *Apprendi* dissenters called the Court's distinction of *Walton* "baffling." The Court claimed that "the jury makes all of the findings necessary to expose the defendant to a death sentence." *Ibid.* That, the dissent said, was "demonstrably untrue," for a *"defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." Ibid.* *Walton,* the *Apprendi* dissenters insisted, if properly followed, would have required the Court to uphold Apprendi's sentence. "If a State can remove from the jury a factual determination that makes the difference between life and death, as *Walton* holds that it can, it is inconceivable why a State cannot do the same with respect to a factual determination that results in only a 10–year increase in the maximum sentence to which a defendant is exposed."

The Arizona Supreme Court, as we earlier recounted, found the *Apprendi* majority's portrayal of Arizona's capital sentencing law incorrect, and the description in JUSTICE O'CONNER's dissent precisely right: "Defendant's death sentence required the judge's factual findings." Recognizing that the Arizona court's construction of the State's own law is authoritative, see *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), we are persuaded that *Walton,* in relevant part, cannot survive the reasoning of *Apprendi.*

*Ring,* 536 U.S. at 601–603, 122 S.Ct. at 2439–40, 153 L.Ed.2d at 572–73 (emphasis added; some internal citations omitted). The Court concluded that:

> For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury.

*Ring,* 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77 (internal citations omitted).

■■■■ As is readily apparent from the opinion of the Court, *Ring* only addresses the eligibility phase of the sentencing process. Those aggravating factors which narrow the class of death-eligible defendants for Eighth Amendment purposes must be found by a proper sentencing authority beyond a reasonable doubt in order to comply with the requirements of the Sixth Amendment. Contrary to the present assertions of Oken, *Ring* holds no implications for the selection phase of Maryland's sentencing process. This is emphasized in the concurring opinion of Justice Scalia, joined by Justice Thomas, noting that:

> [t]oday's judgment has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring,* 536 U.S. at 612–13, 122 S.Ct. at 2445, 153 L.Ed.2d at 579. That *Ring* is inapplicable to Maryland's death penalty statute is further highlighted by the dissenting opinion of Justice O'Connor, observing that the Majority Opinion effec-

tively identified Colorado, Idaho, Montana, Nebraska, Alabama, Delaware, Florida, and Indiana as the affected States. Justice O'Connor observed:

Not only was the decision in *Apprendi* unjustified in my view, but it has also had a severely destabilizing effect on our criminal justice system. I predicted in my dissent that the decision would "unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part on the authority of *[Apprendi]*." As of May 31, 2002, less than two years after *Apprendi* was announced, the United States Courts of Appeals had decided approximately 1,802 criminal appeals in which defendants challenged their sentences, and in some cases even their convictions, under *Apprendi*. These federal appeals are likely only the tip of the iceberg, as federal criminal prosecutions represent a tiny fraction of the total number of criminal prosecutions nationwide. ("In 1998 ... federal criminal prosecutions represented only about 0.4% of the total number of criminal prosecutions in federal and state courts"). The number of second or successive habeas corpus petitions filed in the federal courts also increased by 77% in 2001, a phenomenon the Administrative Office of the United States Courts attributes to prisoners bringing *Apprendi* claims. This Court has been similarly overwhelmed by the aftershocks of *Apprendi*. A survey of the petitions for certiorari we received in the past year indicates that 18% raised *Apprendi*-related claims. It is simply beyond dispute that *Apprendi* threw countless criminal sentences into doubt and thereby caused an enormous increase in the workload of an already overburdened judiciary.

The decision today is only going to add to these already serious effects. The Court effectively declares five States' capital sentencing schemes unconstitutional. See *ante*, at 603, n. 5 [122 S.Ct. at 2440, n. 5] (identifying Colorado, Idaho, Montana, and Nebraska as having sentencing schemes like Arizona's). There are 168 prisoners on death row in these States, each of whom is now likely to challenge his or her death sentence. I believe many of these chal-

lenges will ultimately be unsuccessful, either because the prisoners will be unable to satisfy the standards of harmless error or plain error review, or because, having completed their direct appeals, they will be barred from taking advantage of today's holding on federal collateral review. Nonetheless, the need to evaluate these claims will greatly burden the courts in these five States. In addition, I fear that the prisoners on death row in Alabama, Delaware, Florida, and Indiana, which the Court identifies as having hybrid sentencing schemes in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determination, see *ante*, at 608, n. 6, [122 S.Ct. at 2442] may also seize on today's decision to challenge their sentences. There are 529 prisoners on death row in these States. *Ring*, 536 U.S. at 619–21, 122 S.Ct. at 2449–50, 153 L.Ed.2d at 583–85 (footnotes omitted and some internal citations omitted). Because the Maryland statute already requires that the finding of the existence of an aggravating circumstance must be made by a jury beyond a reasonable doubt, the Maryland statute is unaffected by the *Ring* holding.

## VII

■   In *Borchardt*, we observed that:

The issue of whether § 413(h) violates due process by excusing the State from the burden of proving, beyond a reasonable doubt, that the aggravating circumstances found by the jury outweigh any mitigating circumstances it finds to exist has been resolved by this Court on numerous occasions, beginning with *Tichnell v. State*, 287 Md. 695, 729–34, 415 A.2d 830, 848–50 (1980), and ending, most recently, in *Ware v. State*, 360 Md. 650, 712–13, 759 A.2d 764, 797 (2000), *cert. denied*, 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001). We have consistently found no due process violation in the provision directing that the weighing process be based on a preponderance of the evidence. That is the scheme ordained by the Legislature, and we have declared, at least 12 times, that it complies with the requirements of due process.

367 Md. at 121, 786 A.2d at 648–49. Today we so hold again. According to the Petitioner here, the rationale of *Ring* effectively overrules *sub silentio* our holding in *Borchardt* that nothing in *Apprendi* invalidates Maryland's capital sentencing statutes. Petitioner is incorrect. Despite our conclusion, however, that the holding in *Ring* is inapplicable to the selection phase of the Maryland sentencing process, and thus inapplicable to the weighing of aggravating and mitigating factors, *Borchardt* does not survive *Ring* totally unscathed.

As noted, *supra*, we presented three rationales supporting the conclusions reached in *Borchardt*. Least important of these was our observation that the *Apprendi* majority explicitly stated that its decision did not render its holding in *Walton* invalid. 367 Md. at 121–22, 786 A.2d at 649. Obviously, the *Ring* holding specifically overruling *Walton* and requiring that aggravating factors must be found by the proper sentencing authority beyond a reasonable doubt, eliminates this comparison as a rationale for holding that the Maryland death penalty is unaffected by *Apprendi*.

The second rationale advanced by the Court majority in *Borchardt* relied upon a plain language reading of Maryland's death penalty statute. The majority noted that § 412(b) set forth a range of potential sentences, with life imprisonment as the low end and death as the high end. The majority stated:

As noted, Maryland law makes death the maximum penalty for first degree murder. Under § 412(b), death is the high end of the statutory range that has life imprisonment as the low end and life imprisonment without possibility of parole as the median. Neither the existence of an aggravating circumstance, nor the absence of any mitigating circumstances, nor the jury's determination that the aggravating circumstance(s) it has found to exist outweighs any mitigating circumstances, serves to increase in any way "the prescribed statutory maximum" or, indeed, the statutory range. The existence of those circumstances and the relative weight to be given to them are nothing more than standards that, pursuant to Supreme Court mandate, the Legislature

has required to be applied in determining which sentence *within the statutory range* is to be imposed.

367 Md. at 123, 786 A.2d at 650. As *Ring* now makes clear, this statement is not entirely correct, as it places both the finding of aggravating factors and the finding and weighing of factors in mitigation on the selection side of the sentencing process.

Oken advances two arguments why our second rationale in *Borchardt* is incorrect and for support turns to the dissenting opinion in *Borchardt* and to language in *Ring*. Petitioner specifically looks to the following language from the *Borchardt* dissent:

> More importantly, unlike the Arizona death penalty statute at issue in *Walton*, the Maryland death penalty statute establishes life imprisonment as the basic, default maximum penalty for murder, a characteristic that makes Maryland unique among American death penalty jurisdictions. In most states, a defendant essentially becomes "death eligible" upon conviction of a potentially capital crime, and the sentencing proceeding is merely a vehicle through which the sentencing authority selects from within a potential range of sentences, usually between life imprisonment and death. In Maryland, however, a defendant is not eligible to receive a death sentence after being convicted of first degree murder. Rather, certain additional conditions must be met, including a finding by the sentencing authority that the aggravating circumstances outweigh the mitigating circumstances. As a result, in Maryland, the finding that aggravators outweigh mitigators is much more akin to the finding that aggravating circumstances exist, which must be proven beyond a reasonable doubt, than it is to a finding that there are mitigating circumstances to be considered. Within the holding of *Apprendi*, therefore, due process requires that it be made beyond a reasonable doubt.

367 Md. at 158–59, 786 A.2d at 671 (internal citations omitted) (Dissent by Raker, J., joined by Bell, C.J., and Eldridge, J.). This assertion by the dissent in *Borchardt* is incorrect. If, as

the dissent suggested there, defendants in most States were death-eligible prior to the finding of aggravating circumstances, the death statutes in those states would be unconstitutional under the Supreme Court's post-*Furman* jurisprudence. As we pointed out, *supra,* however, it is the finding of at least one aggravating circumstance that makes a defendant death-eligible. The distinction the quoted passage from the *Borchardt* dissent attempts to make is, therefore, factually and legally incorrect, and reflects a fundamental misunderstanding of the requirements of the Supreme Court's death penalty jurisprudence, and particularly the distinction between the eligibility phase and the selection phase of the sentencing process. *See* discussion of *Buchanan, supra* at 244–46. As both the Court's Eighth Amendment jurisprudence and its holding in *Ring* make clear, it is the finding of an aggravating circumstance, and only the finding of an aggravating circumstance, which makes a defendant death-eligible. Thus, Oken gains no traction from the *Borchardt* dissent to advance his position here.

Oken's reliance on language in the *Ring* opinion for support of his contention that the second *Borchardt* rationale is no longer valid, however, is at least partially meritorious. In *Ring,* Arizona made an almost identical statutory interpretation argument as the reasoning employed by the *Borchardt* majority, asserting that the Arizona statute set forth a range of possible sentences and, therefore, the defendant was death-eligible upon conviction. Under Eighth Amendment analysis, and for the same reason that the dissent in *Borchardt* quoted above is in error, such an interpretation does not consider the post-*Furman* jurisprudence requiring that the class of defendants be narrowed by the finding of an aggravating factor during the eligibility phase of the sentencing process.[26] It is

---

26. To be sure, Borchardt, in his Reply Brief (at 2) in this Court, narrowed the basis of his relevant flagship argument to that of a Fourteenth Amendment due process challenge, expressly eschewing reliance on the Eighth Amendment. ("The issue presented by Mr. Borchardt is a Fourteenth Amendment due process consideration, not an Eighth Amendment consideration.").

this Eighth Amendment requirement which *Ring* overlays with a Sixth Amendment requirement. In rejecting the "range of sentencing options" rationale, the Supreme Court in *Ring* observed:

This argument overlooks *Apprendi's* instruction that "the relevant inquiry is one not of form, but of effect." In effect, "the required finding [of an aggravated circumstance] exposed [Ring] to a greater punishment than that authorized by the jury's guilty verdict." The Arizona first-degree murder statute "authorizes a maximum penalty of death only in a formal sense," for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty. ("First degree murder is a class 1 felony and is punishable by death or life imprisonment *as provided by § 13–703."* (emphasis added)). If Arizona prevailed on its opening argument, *Apprendi* would be reduced to a "meaningless and formalistic" rule of statutory drafting.

*Ring,* 536 U.S. at 604, 122 S.Ct. at 2440–41, 153 L.Ed.2d at 573–74 (alteration in original; internal citations omitted).

Maryland Code, Art 27, § 412 expressly references § 413 with regard to capital sentencing. We know from the legislative history, discussed *infra,* that the 1978 statute was drafted to conform with the Supreme Court's post-*Furman* jurisprudence. As a result, while the majority in *Borchardt* was correct in observing that § 412 prescribed a range of sentencing, it is the finding of an aggravating factor during the sentencing process as required by § 413, not the mere finding of guilt, which makes a defendant death-eligible. This is so because the statute was designed to conform with the post-*Furman* requirement that the class of defendants be narrowed by the finding of an aggravating circumstance in order to ensure that the death penalty not be imposed in an "arbitrary" or "freakish" manner. The *Ring* holding makes clear that the act of finding an aggravating circumstance in order to meet the class-narrowing requirements of the Eighth Amendment, at the same time, acts for Sixth Amendment purposes to elevate the maximum sentence of an individual for whom an

aggravating factor is proven. This is because, once proven, the existence of an aggravating circumstance removes a defendant from the class of the convicted, where the possibility of death existed as a potential punishment for the crime, to the narrower class of those who are actually death-eligible. Because the Maryland statutory scheme was written to be in conformance with the Court's post-*Furman* jurisprudence, a defendant may not be subjected to the death penalty under the Maryland statute unless an aggravating factor is proven beyond a reasonable doubt. Because the Maryland statute requires that the finding of an aggravating factor be made by the proper sentencing authority beyond a reasonable doubt, the Maryland statute does not violate the Sixth Amendment requirements most recently explained in *Apprendi* and *Ring*.

The third and final rationale upon which the majority rested the Court's decision in *Borchardt* survives scrutiny under *Ring* unblemished. As we pointed out in *Borchardt*:

Although the dissenters in *Apprendi* perhaps had some reason for concern as to whether a *Walton*-type scheme might be jeopardized, in the sense that the determination of whether aggravating or mitigating circumstances exist is in the nature of a fact-finding process, in which the ultimate determination must be based on evidence, it is a stretch to apply that concern, as Borchardt and the dissent would do, to the weighing process provided for in §§ 413(h). Notwithstanding the language in Article 27 §§ 414(e)(3) directing this Court, on appellate review, to determine whether "the evidence supports the jury's ... finding that the aggravating circumstances outweigh the mitigating circumstances," the weighing process is not a fact-finding one based on evidence. Mitigating circumstances do not negate aggravating circumstances, as alibi negates criminal agency or hot blood negates malice. The statutory circumstances specified or allowed under §§ 413(d) and (g) are entirely independent from one another—the existence of one in no way confirms or detracts from another. The weighing process is purely a judgmental one, of balancing the mitigator(s) against the aggravator(s) to determine whether death is the

appropriate punishment in the particular case. This is a process that not only traditionally, but quintessentially, is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt. *See Gerlaugh v. Lewis,* 898 F.Supp. 1388, 1421–22 (D.Ariz.1995), *aff'd,* 129 F.3d 1027 (9th Cir. 1997), *cert. denied,* 525 U.S. 903, 119 S.Ct. 237, 142 L.Ed.2d 195 (1998) (Constitution does not require weighing beyond a reasonable doubt); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *Miller v. State,* 623 N.E.2d 403, 409 (Ind.1993) (weighing is a balancing process, not a fact to be proven; reasonable doubt standard does not apply).

The incongruity of applying *Apprendi* to this process is particularly apparent with respect to the requirement that, if the determination that aggravating circumstances outweigh mitigating circumstances is treated as an element that must be proved by the State beyond a reasonable doubt, it also must be sufficiently alleged in the indictment. Borchardt has made that argument under both Federal due process and Article 21 of the Maryland Declaration of Rights. No case, to our knowledge, has required that aggravating circumstances, mitigating circumstances, or a weighing of them be set forth in the indictment, yet, if *Apprendi* and *Jones* are applicable, that clearly would be so under Federal due process and likely would be so as well under Article 21.

367 Md at 126–27, 786 A.2d at 652.[27] *Ring,* by its terms, only addresses the finding of aggravating factors during the eligibility phase of the sentencing process, as dictated by the Supreme Court's post-*Furman* jurisprudence. *Ring* does not pertain to the selection phase of the sentencing process. The Supreme Court consistently has stated, as pointed out in the cases reviewed *supra,* that so long as there are no undue restraints upon the sentencing authority's ability to consider

---

**27.** See discussion of *Barclay, supra* at 47–49, 103 S.Ct. 3418, *Penry, supra* at 49, n. 20, 109 S.Ct. 2934.

mitigating circumstances, there are no constitutional require-ments regarding the actual act of selection, or regarding the relative weight attached to the factors.[28]

## VIII

■■■ Oken's final contention relies on the semantic obser-vations of the *Borchardt* dissent when he argues that the plain language of the Maryland statute requires that we view the weighing process as a "factfinding," and, thus, subject to *Apprendi.* The dissenters in *Borchardt* wrote:

> In light of the structure of the Maryland statute govern-ing imposition of the death penalty, and consistent with the language in *Johnson* [*v. State*, 362 Md. 525, 529, 766 A.2d 93, 96 (2001)] the finding that the aggravating circum-stances outweigh the mitigating circumstances, pursuant to

---

28. In addition to those cases cited *supra,* the distinction between the eligibility phase and the selection phase of sentencing also was noted when the Court reviewed the South Carolina death statute in *Shafer v. South Carolina,* 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001). There the Court explained:

> South Carolina, in line with other States, gives capital juries, at the penalty phase, discrete and sequential functions. Initially, capital juries serve as factfinders in determining whether an alleged aggrava-ting circumstance exists. Once that factual threshold is passed, the jurors exercise discretion in determining the punishment that ought to be imposed. The trial judge in Shafer's case recognized the critical difference in the two functions. He charged that "[a] statuto-ry aggravating circumstance is a fact, an incident, a detail or an occurrence," the existence of which must be found beyond a reason-able doubt. App. 203. Turning to the sentencing choice, he referred to considerations of "fairness and mercy," and the defendant's "mor-al culpability." App. 204. He also instructed that the jury was free to decide "whether ... for any reason or no reason at all Mr. Shafer should be sentenced to life imprisonment rather than to death." App. 203.

> \* \* \* \* \*

> The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself. If no aggravator is found, the judge takes over and has sole authority to impose the mandatory minimum so heavily relied upon by the South Carolina Supreme Court. See *supra,* at 45–46, 49[, 121 S.Ct. at 1270–71, 1272]. It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical.

*Shafer,* 532 U.S. at 50–51, 121 S.Ct. at 1272–73, 149 L.Ed.2d at 191–92.

§ 413(h), clearly exposes a defendant to an increased potential range of punishment beyond the mere conviction for first degree murder.

In keeping with *McMillan's* [*McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) ] deference to the legislative determination of the elements of a particular crime, it is the particular structure of the Maryland statutes and rules governing imposition of the death penalty that guides the analysis of the requirements of due process under *Apprendi.* In enacting §§ 413 and 414 of the death penalty statute, the General Assembly expressed an intention to base death sentences in Maryland on a *factual finding* within the meaning of *Apprendi* in two ways: first, by mandating that the sentencer *find* that the aggravators outweigh the mitigators *by a preponderance of the evidence;* and, second, by requiring that the Court of Appeals review that factual finding for *sufficiency of the evidence.*

While ordinarily, the broad deference accorded to state legislatures in defining the elements of offenses under *Winship* [*In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ] and its progeny results in state statutes being upheld against the minimal requirements of due process, in the present case, the way that the Maryland General Assembly has chosen to define the death penalty procedures is precisely what implicates and offends the strictures of the Due Process Clause. The fact that the General Assembly prescribed a burden of proof for the weighing process of § 413(h) at all is the clearest indication that the legislature envisioned this determination as a factual finding.

367 Md. at 156–57, 786 A.2d at 669–70.[29] The dissent in *Borchardt* cited no legislative history or other authority to

---

**29.** The dissent in *Borchardt* further noted:

Unlike most states that establish a punishment range of life imprisonment to death for first degree murder and then delegate to the sentencing authority the choice between the two based upon a normative judgment, the Maryland statute prescribes that the penalty for first degree murder is life imprisonment, *unless* a series of additional conditions are met, including the weighing of aggravating and miti-

support its conclusory insights as to legislative intent. That is explained by the fact that no such support exists. A review of the relevant legislative history indicates that neither the Legislature nor the Governor intended the meaning ascribed to the words of the statute by the *Borchardt* dissent.

After we declared the Maryland death penalty unconstitutional in *Blackwell* for the second time since *Furman,* our Legislature set about writing a new Maryland statute which would conform with the Supreme Court's post-*Furman* jurisprudence. The fruit of those efforts was Senate Bill (S.B.) 374 and House Bill (H.B.) 604 of 1978, which became the current statute. In 1977, a prior, related bill, S.B. 106, had been vetoed by then Governor Marvin Mandel. Vol. II, Laws of Maryland 1977 at 3771. A proper understanding of the intent of the 1978 legislation requires consideration of both years' efforts.

As Governor Mandel's 1977 veto message regarding S.B. 106 explained, after our decision in *Blackwell,* the Governor asked the Attorney General's office to prepare a bill, as an Administration initiative, "that would conform to the underlying Constitutional requirements, that would be free from ambiguity and interpretive problems, and that could be effectively administered." *Id.* at 3772. The Legislature ultimately ignored the Administration's bill, and instead enacted S.B. 106, which Governor Mandel vetoed. Attached to his veto was a

gating circumstances mandated by § 413. *See* § 412(b). Death sentences are then automatically reviewed by this Court for sufficiency of the evidence. *See* § 414(e). The General Assembly could not have conceived of this sentencing determination as the type of "purely judgmental" choice, *see* maj. op. at 126[, 786 A.2d at 652], within a range of permissible sentences, like the statutes at issue in *Walton,* etc., but rather established a death sentence as an enhanced penalty based upon the establishment of additional facts (namely, that there are aggravating circumstances that outweigh mitigating circumstances) by a particular standard of proof that is reviewable, as a matter of law, at the appellate level. It is this factfinding process that brings § 413 within the strictures of *Apprendi* and the Due Process Clause, even though it is still an open question whether statutes like the one upheld in *Walton* will survive Supreme Court review after *Apprendi.*
367 Md. at 161–62, 786 A.2d at 673.

letter from the State Law Department reviewing the bill adopted by the Legislature. The first two pages of that letter recite the Legislature's concern with creating a bifurcated procedure which would be in conformance with the requirements set forth by the Supreme Court in *Furman, Gregg, Jurek,*[30] *and Proffitt,* observing that "these considerations were of paramount importance in the review of the presently existing Maryland death penalty statute conducted by the Court of Appeals of Maryland in its opinion delivered on 9 November 1976, in *Blackwell v. State." Id.* at 3775.

The State Law Department's letter makes perfectly clear what the Legislature's understanding of what would be required for a statute to pass constitutional muster. The analysis in the letter states:

> From our previous analysis of the Supreme Court decisions on capital punishment we may conclude that the states have been afforded reasonable latitude in enacting laws relating to the death penalty. The statutes of Florida, Georgia and Texas utilized three distinct and different procedures for imposition of the death penalty and each was upheld. Three broad requirements run through the Supreme Court analysis of these statutes which govern the constitutional acceptability of a death penalty statute, viz: (1) a bifurcated hearing on the issue of guilt and penalty, (2) most importantly (and what we judge to be an absolute prerequisite), a procedure which permits the sentencing judge or jury to focus on both the circumstances of the offense and the individual defendant, with the opportunity to consider the character and record of the defendant with particular reference to mitigating factors, and (3) meaningful appellate review which permits a comparison of the sentence with the penalties imposed in similar cases throughout the State. Based upon these factors we believe Senate Bill 106 meets these basic requirements and would pass constitutional scrutiny on its face.

---

**30.** *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

We must recognize that all death penalty or other sentencing statutes could be found, in particular cases or classes of cases, to have been unconstitutionally applied. However, with respect to Senate Bill 106, we believe that the statutory directions to the sentencing authority to objectively consider the nature of the offence (the aggravating circumstances), and more importantly the mitigating factors applicable to the particular person and to the circumstances of the criminal action in question, provide the basic type of focus and guidance deemed to be of the utmost importance by the Supreme Court. *Use of the bifurcated proceeding with imposition of the death penalty limited to those cases where specified aggravating circumstances were established,* coupled with provisions for a trial court report and automatic, expedited appellate review, represents the general scheme regarded by the Supreme Court as preferable from the constitutional viewpoint. Accordingly, we conclude that Senate Bill 106 would, on its fact meet the constitutional tests of *Gregg v. Georgia, supra,* and its companion Supreme Court cases.

*Id.* at 3779–80 (emphasis added).

The State Law Department, however, did identify one problem with S.B. 106 that it felt had constitutional dimensions, a problem which, as will be seen, was rectified in the 1978 statute. The Department observed that:

A particularly significant problem is presented by the failure of Senate Bill 106 to identify the standards or burden of proof by which the jury or judge should determine the presence of either aggravating or mitigating circumstances, or the relative balancing of the two, in order to reach a sentencing decision. The statute is silent as to whether the State must prove the existence of one or more aggravating circumstances beyond a reasonable doubt, by clear and convincing evidence, by substantial evidence, by a preponderance of the evidence, or by some other standard. Similarly, the statute does not deal with the burden of proof applicable to a determination of whether one or more mitigating circumstances are present. Finally, assuming one or

more aggravating circumstances are demonstrated, by whatever burden of proof is applied, and one or more mitigating circumstances are established, by whatever burden of proof is applied, the statute fails to tell us what standards should be applied in weighing the aggravating against the mitigating circumstances.

In this respect Senate Bill 106 shares a defect present in the Florida statute, upheld as facially constitutional in *Proffitt v. Florida, supra.* The Supreme Court of Florida in *State v. Dixon,* 283 So.2d 1, 9 (1973) partially answered the burden of proof question under the Florida law as follows:

> "The aggravating circumstances of Fla. Stat. Sec. 921.141(6) actually define those crimes—when read in conjunction with Fla. Stat. Section 782.04(1) and 794.01(1)—to which the death penalty is applicable in the absence of mitigating circumstances. As such they must be proved beyond a reasonable doubt before being considered by judge or jury."

The Court in *Dixon* went on to describe the process of weighing aggravating and mitigating circumstances without truly defining the quantum or weight of evidence or burden on either of the parties to prove or disprove the existence of mitigating circumstances or to show the at they do or do not outweigh any aggravating circumstances found to exist.[31] It may well be that the Maryland Court of Appeals would follow the holding in *State v. Dixon* that the aggravating circumstances must be proved beyond a reasonable doubt, and we consider such a result likely if not certain. *While we incline towards the view that the burden of proof with respect to mitigating circumstances and the weighing process will be some lesser standard,* we cannot predict with any degree of certainty just what standard the Maryland

---

**31.** Footnote 20 of the Department's letter notes that "The Florida pattern jury instructions confirm the beyond a reasonable doubt standard for aggravating circumstances but do not specifically deal with the standard applicable to mitigating circumstances or the weighing process."

Court of Appeals may ultimately require.[32]  *Just as we are left to speculate, so too will trial court judges, as they preside over capital punishment trials—at least until the first occasion on which the Court of Appeals addresses the question.  Until that question is definitively resolved, as it should have been in Senate Bill 106, trial court judges will proceed to fashion jury instruction which they believe to be appropriate and will apply the burdens and standards which they believe are applicable to their own sentencing decision, but they will do so at some risk.  There is no assurance whatsoever that one trial judge will adopt the same burdens of proof and instructions as another trial judge, and it is distinctly possible that defendants will be tried in various jurisdictions throughout the State under different burdens of proof and different jury instructions.  While this may all be resolved on day by the Court of Appeals, the uncertainty which will exist in the meantime, and the uneven application of the death penalty statute which is likely to occur, will hardly be conductive to the kind of fair and evenhanded administration of a capital punishment law which the Supreme Court has set forth as the constitutional objective which must be pursued by a valid statutory scheme.*[33]

*Id.* at 3793–95 (emphasis added).

As noted, S.B. 106 was vetoed by Governor Mandel.  The next year, his successor, Governor Blair Lee III, signed into

---

**32.**  Footnote 21 of the Department's letter notes that the Bill proposed by the Administration "specifically applied a beyond a reasonable doubt test as to the aggravating circumstances and a preponderance of the evidence test as to mitigating circumstances and the weighing process."

**33.**  Footnote 22 of the Department's report observes:  "We cannot say with any degree of certainty that the Court of Appeals, in conjunction with the Rules Committee, would consider adopting pattern jury instructions for statewide application on the burden of proof and other matters pertinent to capital punishment trials."  The Court of Appeals might well feel that it lacks the power to adopt a rule governing a substantive matter such as the burden of proof in a capital sentencing proceeding, and even if it felt it possessed the power to adopt such a

law the successor legislation. In a letter, dated 24 January 1978, then Maryland Attorney General Francis B. Burch advised Governor Lee as to the constitutionality of the new law. After discussing the focus of the Bill in conforming to the Supreme Court's holdings in *Furman, Gregg, Jurek, and Proffitt,* the Attorney General concluded, at pp. 10–11:

As we have previously noted, the General Assembly did not enact the Administration Bill at its last session, but did enact Senate Bill 106 which was another attempt to provide for the death penalty as an optional sentence for certain types of first degree murder. Following consideration of an exhaustive analysis of the bill by this office, Governor Mandel vetoed Senate Bill 106, not because of his or our belief that it was facially unconstitutional or that it failed to meet the broad outlines set forth by the Supreme Court in *Gregg v. Georgia, supra* and its companion cases, but rather because of the serious ambiguities and uncertainties contained in Senate Bill 106, as amended, which would have inevitably resulted in substantial litigation and consequent delay in the actual implementation of the Bill. As we noted in our opinion to Governor Mandel, the very infrequency of imposition could serve to reduce its efficacy as a deterrent force and create a constitutional deficiency. See the veto message of Governor Mandel, Vol. II, Laws of Maryland 1977, p. 3771.

The one question which concerned us the most with respect to Senate Bill 106 was its failure to identify the applicable burdens of proof by which the jury or judge should determine the presence of aggravating or mitigating circumstances as well as the relative balancing of the two. We also identified the following other significant concerns in our analysis of Senate Bill 106 as amended: (1) the uncertainties surrounding the result in the event of a "hung jury" at the sentencing proceeding, (2) the lack of a clear requirement for pretrial notification that the State will seek the

---

rule, it might well choose not to do so but to simply await the presentation of the issue in a case brought up on appeal.

death penalty with specific reference to each aggravating circumstance on which it will rely; and (3) the potential uncertainty surrounding the degree of specificity required of the jury in giving its recommendation. Since Senate Bill 106 was patterned closely after the Florida statute, we believe that the extensive judicial interpretation of that statute by the Florida courts played a great part in the Supreme Court's approval of that capital punishment statute. There had been, of course, no such period of judicial interpretation in Maryland and we foresaw delays in the implementation of the statute while the interpretive questions were considered seriatim by the Court of Appeals.

Both Governor Mandel and I suggested last spring that the legislature should consider a death penalty statute which is both facially constitutional and more precise than Senate Bill 106, as amended, at the next (this year's) session of the General Assembly. I believe that the new Administration Bill (pre-filed Senate Bill 371 and House Bill 604) meets these criteria and will rectify the difficulties which we noted in our analysis of last year's Senate Bill 106.

Far from supporting the contentions of the *Borchardt* dissent that weighing was intended to be "a *factual finding* within the meaning of *Apprendi*," this history reveals exactly the opposite intent. The requirements for mandatory review were deemed necessary by the Supreme Court's post-*Furman* jurisprudence, viewed as requiring automatic and meaningful appellate review, nothing more. As for weighing, the legislative history makes clear that the intention behind supplying a standard at all was an attempt to insure that the statute would be applied in a consistent manner between the various county circuit courts of the State, thus frustrating inconsistencies in application which would violate the post-*Furman* requirements and result in successful Eighth Amendment attacks on the statute.

## IX

Our review of the Constitutional requirements set forth by the Supreme Court's post-*Furman* jurisprudence, as well as

the legislative history of the modern iterations of the Maryland death penalty statute, leads us to conclude that the Sixth Amendment requirements of *Apprendi* and *Ring* must be viewed within the context of the Supreme Court's Eighth Amendment jurisprudence to which the Maryland statutes were designed to conform. It is beyond dispute that the Supreme Court's Eighth Amendment jurisprudence approves the use of a bifurcated system where sentencing is separate from trial and conviction. It is equally beyond dispute that the sentencing process itself is a bifurcated proceeding involving an eligibility phase and a selection phase, each of which operates within a separate and distinct constitutional jurisprudence. It is within this framework that the Sixth Amendment requirements of *Ring* must be viewed.

The Supreme Court repeatedly has stated, as has the legislative history of the Maryland statute, that it is the finding of an aggravating circumstance or circumstances which makes a convicted defendant death-eligible. It is this finding which performs the function of narrowing the class of eligible defendants as required by *Furman*. By reverse implication, it is also this finding which exposes the convicted defendant to the statutory maximum. *Ring*, which by its terms addresses only the finding of aggravating circumstances, makes clear that these are opposite sides of the same coin. We therefore conclude that the selection phase of the sentencing process, involving weighing, is not affected by the requirements of *Ring*.

We also conclude that the Maryland death penalty statute cannot be read to be implicated by *Ring* under any theory of legislative interpretation. The legislative history indicates that the weighing process never was intended to be a component of a "fact finding" process required to narrow the class of death-eligible defendants. Rather, the history shows that the Legislature and Governor understood that the finding of an aggravating circumstance alone performed that *Furman* requirement. Far from being designed to further refine the class of death-eligible defendants, the assignment of a stan-

dard to the weighing process was intended to protect the statute from Constitutional attack by such defendants.

**AFFIRMED, WITH COSTS.**

RAKER, Judge, with whom BELL, Chief Judge and ELDRIDGE, Judge, join, dissenting:

I respectfully dissent. I would hold that the portion of Maryland Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Article 27, § 413(h) [1] that provides that punishment shall be death if the sentencing authority [2] finds that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence violates due process under the Fourteenth Amendment and the Sixth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights. I adhere to my views expressed in the dissent in *Borchardt v. State*, 367 Md. 91, 786 A.2d 631 (2001) (Raker, J., dissenting, joined by Bell, C.J. and Eldridge, J.), stating that the sentencing authority must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt and not by a preponderance of the evidence. I would sever the unconstitutional portion of the statute, require the reasonable doubt standard to be applied as a matter of law, and vacate appellant's sentence of death imposed pursuant to § 413.

### Summary of Discussion

Under the Maryland death penalty scheme, the State must give notice of an intent to seek the death penalty and allege in that notice, the existence of a statutory aggravating factor. With the exception of a contract murder and the killing of a law enforcement officer, the jury must find that the State has

---

**1.** The majority opinion cites to the Maryland Code as it existed prior to the 2002 recodification. Maj. op. at 195. For consistency, I will do the same. Unless otherwise indicated, all statutory references are to Maryland Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Article 27.

**2.** Future references to the sentencing authority will be to a jury, with the recognition that the defendant may waive the right to have the sentence determined by a jury and may elect to have the court sentence. *See* Art. 27, § 413(b)(3)(k)(3).

proven, beyond a reasonable doubt, that the defendant was a principal in the first degree. The jury must find that the State has proven, beyond a reasonable doubt, the existence of at least one aggravating factor. The jury must also find that the aggravating factors outweigh the mitigating factors. The statute states that the sentence shall be death if the jury finds that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence. This finding is a necessary predicate to the imposition of a sentence of death. In my view, the jury must find this last and ultimate "finding" beyond a reasonable doubt.

*Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in the framework of the Maryland death penalty statute, mandate that the jury must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt and not by a mere preponderance of the evidence. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455. *Ring* made clear that *Apprendi* applied to death penalty proceedings, reasoning that "[c]apital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564.

The maximum sentence for first degree murder in Maryland is life imprisonment. Life imprisonment without the possibility of parole and death are enhanced penalties and may not be imposed unless the State meets the statutory requirements justifying enhancement. The Maryland statutory scheme requires that before a sentence of death may be imposed, the jury must make certain additional findings beyond the finding of guilt of the murder. Those findings increase the maximum penalty from life to death.

The plain language of the Maryland death penalty statute requires certain findings during the weighing stage as an absolute precondition for the imposition of the death penalty, a determination on which the Maryland General Assembly conditioned an increase in the penalty from life imprisonment to death. These findings are, at a minimum, partially factual and are quintessentially *Apprendi* type findings, requiring proof beyond a reasonable doubt.

## I. Maryland Death Penalty Statute

The penalty for first degree murder in Maryland is "death, imprisonment for life, or imprisonment for life without the possibility of parole." § 412(b). The sentence shall be imprisonment for life *unless* a sentence of death is imposed in accordance with § 413. *Id.* The statute mandates that the jury first consider and *find*, beyond a reasonable doubt, whether any alleged aggravating circumstances exist. § 413(d) & (f). The jury must then consider and *find*, by a preponderance of the evidence, whether one or more mitigating circumstances exist. § 413(g). Finally, the jury must determine, by a preponderance of the evidence, whether the aggravating circumstances outweigh the mitigating circumstances.[3] § 413(h)(1). If the jury *finds* that the aggravating circumstances outweigh the mitigating circumstances, "the sentence shall be death." § 413(h)(2). The trial court is then instructed to impose a sentence as decided by the jury. § 414(k)(1). After sentence is imposed, Maryland Rule 4–343(k) requires the trial judge to promptly prepare, send to the parties, and file with the Clerk of the Court of Appeals a report in the form prescribed by the Rule, including a recommendation of the trial court as to whether imposition of a death sentence is justified. The statute requires the Court of Appeals to review the imposition of the death penalty and, *inter alia*, to determine "[w]hether the *evidence* supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances." § 414(e)(3) (emphasis added).

---

3. Maryland is regarded as a "weighing" state.

## II. *Borchardt v. State*

In *Borchardt v. State*, 367 Md. 91, 786 A.2d 631 (2001), a divided Court held that the Maryland death penalty scheme does not run afoul of *Apprendi* and that the statute passes constitutional muster. The Court rejected appellant's arguments in that case on three grounds: (1) that *Apprendi* did not apply to capital sentencing schemes; (2) that the maximum penalty for first degree murder in Maryland was death and that Borchardt did not receive a sentence in excess of the statutory maximum; and (3) that *Apprendi* is inapplicable to the weighing of aggravators against mitigators because the process is a purely judgmental one and the weighing process is a sentencing factor. In rejecting appellant's arguments in *Borchardt*, the majority reasoned as follows:

"Perhaps the easiest answer lies in the unequivocal statement by the *Apprendi* majority that its decision did not render invalid State capital sentencing schemes, such as approved in *Walton*, that allowed the judge, not sitting as the trier of fact, to find and weigh specific aggravating factors. If it is permissible under *Apprendi* for the law to remove that fact-finding and fact-weighing process *entirely* from the jury and leave it to the judge as a legitimate sentencing factor, without specifying a reasonable doubt standard, it can hardly be impermissible for a jury that has found the prerequisite aggravating factors beyond a reasonable doubt to apply a preponderance standard in weighing them against any mitigating circumstances. The *Walton* scheme, in other words, is in far greater direct conflict with the underpinning of *Apprendi* than the Maryland approach. Thus, if the aggravating circumstances do not constitute elements of the offense or serve to increase the maximum punishment for the offense in the *Walton* context, they cannot reasonably be found to have that status under the Maryland law. *If Apprendi renders the Maryland law unconstitutional, then, perforce, it likely renders most of the capital punishment laws in the country unconstitutional.* We cannot conceive that the Supreme Court, especially in light of its contrary statement, intended such a dramatic

result to flow from a case that did not even involve a capital punishment law."

*Id.* at 121–22, 786 A.2d at 649 (footnote omitted).

That reasoning was wrong. The majority acknowledges that it was wrong. *See* maj. op. at 253, 255. As a result, the foundation of the majority's reasoning set out in *Borchardt* no longer exists. In *Ring v. Arizona,* 536 U.S. at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564, the Supreme Court expressly overruled *Walton* because the reasoning in *Apprendi* is "irreconcilable" with the holding in *Walton.*

The majority continues to rely on the third *Borchardt* prong—the only one the majority finds to survive *Ring. See* maj. op. at 257. The majority maintains that "the weighing process is purely a judgmental one, of balancing the mitigator[s] against the aggravator[s] to determine whether death is the appropriate punishment in the particular case. This is a process that not only traditionally, but quintessentially is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt." Maj. op. at 208 (quoting *Borchardt,* 367 Md. at 126–27, 786 A.2d at 652).

## III.  *Ring v. Arizona* and *Apprendi v. New Jersey*

*Ring* and *Apprendi* entitle a capital defendant to a jury determination of the facts on which eligibility for a death sentence is predicated. In *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455 (2000), the Supreme Court held that regardless of the labeling by a State, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court made clear that "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457.

In *Ring,* the Supreme Court held the Arizona death penalty statute unconstitutional because under that statute, a judge, rather than a jury, was required to determine the existence of an aggravating factor, thereby making the factual findings prerequisite to the imposition of the death penalty following a jury determination of a defendant's guilt of first degree murder. *Ring,* 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77. The Court held that the Arizona statute violated the defendant's Sixth Amendment right to trial by jury. *Id.* The Court expressly overruled *Walton* in favor of *Apprendi's* Sixth Amendment approach, reasoning that "[c]apital defendants, no less than non-capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564. The Court concluded that the Arizona statute was invalid because the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" and therefore "the Sixth Amendment requires that they be found by a jury." *Id.* at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 577 (quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19).

Thus, contrary to the majority's assertion in *Borchardt* that *Apprendi* has no application to death penalty sentencing proceedings, the Supreme Court applied the *Apprendi* holding that "the Sixth Amendment does not permit a defendant to be 'expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" *Ring,* 536 U.S. at 588–89, 122 S.Ct. at 2432, 153 L.Ed.2d at 564 (quoting *Apprendi,* 530 U.S. at 483, 120 S.Ct. at 2359, 147 L.Ed.2d at 450).

The *Ring* Court pointed out that every fact that the legislature requires before death may be imposed be found by a jury beyond a reasonable doubt. The Court reiterated that "the dispositive question ... 'is one not of form, but of effect.'" *Ring,* 536 U.S. at 602, 122 S.Ct. at 2439, 153 L.Ed.2d at 572 (quoting *Apprendi,* 530 U.S. at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457). The Court stated:

"If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."

*Id.*

## IV. Application of *Ring/Apprendi*

The weighing portion of Maryland's death penalty law violates due process under the Fourteenth Amendment and Sixth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights because the balancing serves as an absolute prerequisite finding to a death sentence and, thus, must be subject to the reasonable doubt standard.[4] Accordingly, under *Ring* and *Apprendi*, the trier of fact must find that the aggravating outweigh the mitigating factors *beyond a reasonable doubt.*

A defendant does not become death-eligible under the Maryland statutory scheme until the jury finds that the aggravators outweigh the mitigators. Under the Maryland statute, the weighing process includes the jury determination that the ultimate penalty of death is the appropriate sentence. Until the jury makes this finding, the defendant is not eligible for a sentence of death.

The maximum penalty for first degree murder in Maryland is life imprisonment; death or life imprisonment without the

---

4. I need not recount the history of the rule announced in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that due process requires that every fact necessary to the crime charged be proven beyond a reasonable doubt. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) through *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi* and *Ring. See also Borchardt,* 367 Md. at 151–52, 786 A.2d at 667 (Raker, J., dissenting); *Evans v. State,* 304 Md. 487, 550–51, 499 A.2d 1261, 1294 (1985) (McAuliffe, J., dissenting) (reasoning that "the basic principles of [due process as explicated in] *Winship, Mullaney* and *Patterson* [*v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)] require[] that the burden of persuasion on this ultimate issue must be upon the State, and the jury must be persuaded beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the penalty of death can be imposed").

possibility of parole are *enhanced* sentences for first degree murder, and are dependent upon special circumstances. *See* maj. op. at 253–54; *Borchardt,* 367 Md. at 154–55, 786 A.2d at 668–69 (Raker, J., dissenting); *Johnson v. State,* 362 Md. 525, 529, 766 A.2d 93, 95 (2001). It is the jury finding that aggravating circumstances outweigh mitigating circumstances that increases the penalty for first degree murder in Maryland beyond the prescribed statutory maximum. *See Johnson,* 362 Md. at 529, 766 A.2d at 95 (holding that "basic sentence" for first degree murder is life imprisonment and that life without parole and death are enhanced penalties); *Gary v. State,* 341 Md. 513, 520, 671 A.2d 495, 498 (1996) (holding that maximum penalty for first degree murder is life imprisonment). Because the default penalty for first degree murder in Maryland is life imprisonment, a jury's determination that aggravating circumstance[s] outweigh mitigating circumstance[s] is an additional finding beyond that of guilt that serves to make a defendant eligible for the enhanced penalty of death. *Ring* and *Apprendi* require that such a finding be made beyond a reasonable doubt.

It is the unique structure of the Maryland death penalty statute that distinguishes the statute from many others, if not all, in the country. Under Maryland law, jurors are factfinders throughout the entire sentencing procedure. Before the sentencing commences, a defendant must be found guilty of first degree murder and at least one aggravating circumstance must be alleged. The State must then present evidence supporting the aggravating circumstance[s]. The jury then engages in a three-step process and proceeds to each succeeding phase of that process only after it makes findings with respect to the preceding phase. First, the jurors must find at least one aggravating circumstance unanimously beyond a reasonable doubt. Second, the jury determines the existence *vel non* of any mitigating circumstances, based on a preponderance of the evidence standard. Third and finally, the jury weighs the aggravating against the mitigating circumstances. Thus, before a defendant is eligible for the death penalty in Maryland, the jury must determine that the aggravating

circumstances outweigh the mitigating circumstances. Included within that determination is the conclusion that death is the appropriate sentence.

Section 413 permits the jury to find as a mitigating circumstance, in addition to those enumerated in § 413(g)(1)-(7), "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." § 413(g)(8). This provision, known as the "catchall" provision, permits a jury to extend mercy, if it is so inclined. *See Grandison v. State*, 305 Md. 685, 756, 506 A.2d 580, 615 (1986). We stated in *Foster v. State*, 304 Md. 439, 474–75, 499 A.2d 1236, 1254 (1985), that the jury, "unconvinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances."

*Ring* describes a substantive element of a capital offense as one which makes an increase in authorized punishment contingent on a finding of fact. Using this description, the substantive elements of capital murder in Maryland are the jury's finding of the aggravating circumstance[s] necessary to support a capital sentence and the fact that the aggravators outweigh the mitigators. It is the latter finding, that aggravators outweigh mitigators, including the determination that death is appropriate, that ultimately authorizes jurors to consider and then to impose a sentence of death. That is, the increase in punishment from life imprisonment to the death penalty is contingent on the factual finding that the aggravators outweigh the mitigators. Under the statute, then, when the jury finds that the aggravating outweigh the mitigating circumstances, the defendant is exposed to an increased potential range of punishment beyond that for a conviction for first degree murder. *See Harris v. United States*, 536 U.S. 545, 567, 122 S.Ct. 2406, 2419, 153 L.Ed.2d 524, 544 (2002) (plurali-

ty opinion) ("Read together, *McMillan* and *Apprendi* mean that those facts setting the outer limits of a sentence, *and of the judicial power to impose it,* are the elements of the crime for the purposes of the constitutional analysis.") (emphasis added). It is evident by reading § 413 and § 414 that the Legislature intended to base a death sentence on a factual finding, first by mandating that the jury find that the aggravators outweigh the mitigators by a specific burden of proof, *i.e.,* by a preponderance of the evidence, and second, by requiring that this Court review that finding for *sufficiency* of the evidence.

Step three, the balancing of the aggravating and mitigating factors, in my view, is a *factual* determination. Unless, and until, the jury finds that the aggravating factor[s] outweigh the mitigating factor[s], the defendant is not eligible for the death penalty. Because it is a factual determination which raises the maximum penalty from life to death, *Ring* requires that the standard be beyond a reasonable doubt.

Three aspects of the statute show that all three steps in the Maryland death penalty scheme are factual in nature. First, the Legislature has provided for a burden of proof in the weighing process. Second, this Court is mandated to review the jury finding of death for sufficiency of the evidence. Finally, the repeated use of the word "find" suggests the determination of an observable fact, *see Webster's Third New International Dictionary* 852 (1961) (defining "finding" as "the result of a judicial or quasi-judicial examination or inquiry especially into matters of fact as embodied in the verdict of a jury or decision of a court, referee, or administrative body").

A standard of proof has commonly been applied to factual findings. *See Olsen v. State,* 67 P.3d 536, 589 (Wyo.2003) (stating that the language of the statute "that aggravating circumstances be proved beyond a reasonable doubt and mitigating circumstances be proved by a preponderance of the evidence references burdens assigned to *factual issues* ") (emphasis added). The prescription by the General Assembly of a specific burden of proof, ordinarily reserved for factual find-

ings, is the clearest indication that the Legislature envisioned this determination as a factual finding.

The burden of proof consists of two components: the burden of going forward and the burden of persuasion. McCormick on Evidence describes the term as follows: "One burden is that of producing evidence, satisfactory to the judge, of a particular fact in issue. The second is the burden of persuading the trier of fact that the alleged fact is true." *McCormick on Evidence* § 336, at 409 (Strong 5th ed.1999) (footnote omitted). In the context of the weighing of aggravating and mitigating circumstances, we refer to the burden of persuasion. In the ordinary civil case, "proof by a preponderance, seems to be proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." *Id.* at 422. The clear-and-convincing burden of persuasion has been described to mean that a fact is "proved" only if the evidence leads the factfinder to the conclusion that the truth of the contention is highly probable. *Id.* at 425. As expressed by Justice Harlan, in *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368, 378 (1970) (concurring opinion), the expression of a "choice of the standard for a particular variety of adjudication does ... reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations." In discussing the function of a standard of proof, he further noted:

"[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of *factual* conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his *factual* conclusions."

*Id.* at 370, 90 S.Ct. at 1076, 25 L.Ed.2d at 379 (emphasis added).

The Maryland Legislature, in providing for a specific burden of proof, recognized that the weighing process was a factual finding, at least in part, that could be satisfied by a preponderance of the evidence standard. This statute was enacted before the Supreme Court spoke in *Apprendi* and in *Ring*. If the majority's view is correct, and the weighing determination is not susceptible of a burden of proof and is merely a judgment call, why would the Legislature have provided for *any* particular burden of proof? As to the two burdens, Justice Stewart of the Utah Supreme Court observed:

> "The 'beyond a reasonable doubt' standard may, of course, be considered similar in its function to proof by a preponderance of evidence, *i.e.*, both standards are used to *resolve factual disputes*."

*State v. Brown,* 607 P.2d 261, 275 (Utah 1980) (emphasis added). The majority characterizes Oken's contention regarding "factfinding" as merely semantics. *See* maj. op. at 260. The majority is resorting to form over substance and relying on labels to avoid the application of *Ring* and *Apprendi*.

The Maryland Legislature has provided for automatic review by the Court of Appeals of the jury's sentence of death for "sufficiency of the evidence." § 414. The Legislature could not have conceived of the death penalty sentencing determination as a "purely judgmental choice" if it provided for appellate review of the *sufficiency of the evidence,* a traditional review of findings of fact. The Legislature established the sentence of death as an enhanced penalty, to be imposed upon the establishment of additional facts (with the ultimate factual finding that the aggravating factors outweigh the mitigating factors) by a particular standard of proof that is reviewable, as a matter of law, at the appellate level.

Commentators recognize that balancing aggravating against mitigating circumstances is a factfinding process. For example:

> "Although there are many variations among the capital sentencing statutes currently in existence, most of these

statutes employ a common, *tripartite factfinding process* that involves the sentencer's making *factual findings on three different issues:* the existence of aggravating circumstances; the existence of mitigating aspects of the defendant's character, record, or offense; and *whether the aggravating circumstances outweigh the mitigating circumstances.* The portion of this tripartite structure that has been the central focus of Sixth Amendment scrutiny up to this point has been the first prong: factfinding on the existence of aggravating circumstances. This was the factfinding determination that the now-overruled *Walton* decision and its jurisprudentially linked predecessor, *Hildwin,* deemed suitable for a judge. And it is the factfinding determination that *Ring,* in overruling *Walton,* reserved for the jury. In the wake of *Ring,* the inevitable next questions for resolution are whether the *Ring* rationale requires a jury also to make the second and third *factfinding* determinations—the determination of the existence of mitigating circumstances and the assessment whether aggravating circumstances outweigh mitigating circumstances."

B. Stevenson, *The Ultimate Authority on the Ultimate Punishment: The Requisite Role of the Jury in Capital Sentencing,* 54 Ala. L.Rev. 1091, 1121 (2003) (emphasis added) (footnote omitted) (hereinafter Stevenson). *See also id.* at 1129 n. 214 (recognizing that balancing of aggravating against mitigating factors is a factual finding: "In Alabama, as in Arizona and Florida, defendants are not eligible for the death penalty unless a *factfinding* is made that aggravating circumstances outweigh mitigating circumstances. Ala.Code § 13A–5–46(e)(2) (2003) (providing that if jury determines that aggravating circumstances do not outweigh mitigating circumstances, jury 'shall' return advisory verdict recommending life imprisonment without parole)").

Noting the tripartite nature of the Arizona death penalty statute, Professor Stevenson argues that the *Ring* reasoning as to the first determination, the finding of an aggravating

factor, applies equally to the other two determinations. He reasons as follows:

"All of the features of the aggravation finding that the *Ring* Court regarded as significant are equally true of the two other components of the tripartite sentencing determination. Arizona law conditions a death sentence upon not just a finding of an aggravating circumstance, but also a determination—after identification of any mitigating circumstances in the case—of whether the ' "mitigating circumstances [are] sufficiently substantial to call for leniency." ' Thus, as the *Ring* Court itself remarked, a defendant cannot 'be sentenced to death [under Arizona law] ... unless [these] further findings [are] made.' Indeed, the statutory feature that the *Ring* Court deemed essential to rejecting the state's characterization of Arizona law as treating a conviction of first-degree murder as sufficient authorization for a death sentence—that the first-degree murder statute itself cross-referenced the aggravation finding as a necessary additional predicate for a sentence of death—applies equally to the other two findings. The statutory cross-reference is not merely to the provision governing the finding of aggravating circumstances: It references the entire tripartite structure for determining the existence of aggravating and mitigating circumstances and gauging their relative weight."

*Id.* at 1126–27 (footnotes omitted). Inasmuch as the Maryland statute requires that the aggravators outweigh the mitigators as an essential predicate for imposition of the death penalty, the central reasoning of *Ring* should apply.

Other states have concluded that *Ring/Apprendi* applies to the balancing process in death cases and, as a result, have held that due process requires that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Recently, the Colorado Supreme Court recognized that a balancing of aggravating factors and mitigating factors can go to a defendant's eligibility for the death penalty. In *Woldt v. People*, 64 P.3d 256 (Colo.2003), following *Ring,* the Colorado Supreme Court concluded that the Colorado death penalty statute, like the Arizona statute, improperly

assigned a factfinding role to a judge in violation of the Sixth Amendment. Noting that "[i]n a weighing state, the trier of fact must weigh the aggravating factors against all the mitigating evidence to determine if the defendant is eligible for death ... A standard of beyond a reasonable doubt applies to eligibility fact-finding." *Id.* at 263. The Colorado statute has four steps, with the third step the weighing one. The court noted that "[t]hrough the first three steps, Colorado's process resembles a weighing state. 'The eligibility phase continues through step three, when the jury weighs mitigating evidence against statutory aggravators.' " *Id.* at 264 (citation omitted). The fourth step, determining whether under all the circumstances, death should be imposed, is the selection stage. The court held that "[b]ecause the Sixth Amendment requires that a jury find any facts necessary to make a defendant eligible for the death penalty, and the first three steps of [the statute], required judges to make findings of fact that render a defendant eligible for death, the statute under which Woldt and Martinez received their death sentences is unconstitutional on its face." *Id.* at 266–67. The court found the balancing stage to be a factfinding stage, required to be determined by a jury and beyond a reasonable doubt as required under *Ring*. *Id.* at 265.

In Maryland, the weighing stage includes elements of eligibility and selection. In that single stage, in concluding that aggravators outweigh mitigators, the jury is both weighing the factors and also determining whether death is appropriate.

Missouri considered the question of whether the principles set out in *Ring* invalidated a death sentence when a judge made the factual determinations on which eligibility for the death sentence was predicated in *State v. Whitfield,* 107 S.W.3d 253 (Mo.2003). Step three of the Missouri statute requires the jury to determine whether the evidence in mitigation outweighs the evidence in aggravation. *Id.* at 259. Like the Maryland statute, "[i]f it does, the defendant is not eligible for death, and the jury must return a sentence of life imprisonment. While the State once more argues that this merely calls for the jury to offer its subjective and discretionary

opinion rather than to make a factual finding, this Court again disagrees." *Id.* The court held that steps one, two, and three (similar to the Maryland steps) "require factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible." *Id.* at 261.[5] The Missouri Supreme Court rejected the state's argument that the finding merely required a subjective finding by the trier of fact, noting as follows:

> "But, the State fails to note that this Court rejected this very argument in its opinion on Mr. Whitfield's appeal of his initial conviction, in which it remanded for the new trial at issue here. In that decision, this Court held that step 2 requires a 'finding of fact by the jury, not a discretionary decision.' *Whitfield,* 837 S.W.2d at 515. This holding is supported by the plain language of the statute. In order to fulfill its duty, the trier of fact is required to make a case-by-case factual determination based on all the aggravating facts the trier of fact finds are present in the case. This is necessarily a determination to be made on the facts of each case. Accordingly, under *Ring,* it is not permissible for a judge to make this factual determination. The jury is required to determine whether the statutory and other aggravators shown by the evidence warrants the imposition of death."

*Id.* at 259 (emphasis omitted).

Similarly, the Nevada Supreme Court, in *Johnson v. State,* 59 P.3d 450 (Nev.2002), held that the weighing of aggravating against mitigating circumstances is in part a factual determination falling within the *Ring* rubric. The court stated:

> "Moreover, Nevada statutory law requires two distinct findings to render a defendant death-eligible: 'The jury or the

---

**5.** In Missouri, step four of the statute requires the jury to assess and declare the punishment at life imprisonment if it decides under all of the circumstances not to assess and declare the punishment at death. Step four in Missouri gives the jury the discretion to give a life sentence. Under the Maryland statute, the Missouri steps three and four are collapsed into one step-step three. Thus, step three in Maryland is a factual finding.

panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance *and further finds* that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.' This second finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that *it is in part a factual determination, not merely discretionary weighing.* So even though *Ring* expressly abstained from ruling on any 'Sixth Amendment claim with respect to mitigating circumstances,' we conclude that *Ring* requires a jury to make this finding as well: 'If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.' "

*Id.* at 460 (second emphasis added) (footnotes omitted).

Wyoming, a weighing state like Maryland, recently addressed the burden of persuasion on the process of weighing aggravating factors against mitigating factors under the state's death penalty statute. *See Olsen v. State,* 67 P.3d 536 (Wyo.2003). The Wyoming statute does not assign a specific burden in directing the jury to "consider aggravating and mitigating circumstances." *Id.* at 587. Nonetheless, the court directed that the jury should be instructed that before the sentence may be death, each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of a life sentence." *Id.* at 588. The court went on to state that the burden of proof in a capital case necessary for a sentence of death remains on the state, and that if the jury is to be instructed to "weigh," the defendant must produce evidence of mitigating circumstances. *Id.* at 589. The court concluded that, "just as with affirmative defenses, the ultimate burden of negating such defenses by proof beyond a reasonable doubt remains with the State." *Id.* at 589 n. 12. *See also State v. Rizzo,* 266 Conn. 171, 236, 833 A.2d 363, 407 (2003) (noting that "Imposing the reasonable doubt standard on the weighing process, moreover, fulfills all of the functions of

burdens of persuasion. By instructing the jury that its level of certitude in arriving at the outcome of the weighing process must meet the demanding standard of beyond a reasonable doubt, we minimize the risk of error, and we communicate both to the jury and to society at large the importance that we place on the awesome decision of whether a convicted capital felon shall live or die.").

Finally, the Supreme Court of Arizona, in *State v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003), on remand from the Supreme Court, rejected the state's argument that the Arizona death penalty statute requiring a judge to weigh aggravating against mitigating circumstances did not require a factual determination. The Arizona court, in concluding that *Ring* required that finding to be made by a jury, necessarily concluded that the determination was a factual one. *Id.* at 942–43.

## V. The Majority's "Eligibility" Distinction

The majority maintains that *"Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors." Maj. op. at 207–08. It is correct that the *Ring* Court did not address specifically the issue of whether, in weighing the aggravators against the mitigators, *Apprendi* applies or whether the jury must be convinced beyond a reasonable doubt before death may be imposed. The Court did not do so, however, most likely because Ring did not argue anything with respect to mitigators or balancing. Ring presented a "tightly delineated" claim, *Ring*, 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4, 153 L.Ed.2d at 569 n. 4, raising *only* the question of whether a trial judge, sitting alone, could determine the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.[6] *Ring*, 536 U.S. at 588, 122

6. Footnote 4 in *Ring v. Arizona*, 536 U.S. 584, 597–98, 122 S.Ct. 2428, 2437, 153 L.Ed.2d 556, 569, makes clear that the weighing process was not before the Court. The Court stated:

"Ring's claim is tightly delineated: He contends *only* that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past

S.Ct. at 2432, 153 L.Ed.2d at 563. Ring argued that the Arizona death penalty statute violated the Sixth and Fourteenth Amendments because it entrusted to a judge the finding of a fact raising the defendant's maximum penalty from life to death. *Id.* at 595, 122 S.Ct. at 2436, 153 L.Ed.2d at 568. Nonetheless, *Ring* set out the general principles that courts must apply in deciding what issues may be decided by a judge and those for which a defendant is entitled to a jury determination, as well as the applicability of the higher reasonable doubt standard at least as to the finding of aggravators. Moreover, as noted earlier, on remand, the Arizona Supreme Court rejected the contention that the requirement that mitigating circumstances be considered and weighed against aggravators was not a factual predicate for imposition of the death penalty. *See State v. Ring,* 65 P.3d at 942–43.

The majority's thesis rests upon the view that due process only requires the finding of aggravating circumstances beyond a reasonable doubt, and not the process of weighing aggravating against mitigating factors. *See* maj. op. at 207–08 (stating that "*Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors"). It is the majority's view that the Supreme Court death penalty jurisprudence requiring the reasonable doubt standard applies only to the part of the sentencing process which makes a defendant death-eligible, as opposed to those elements involved in selecting those death-eligible defendants who will be actually sentenced to death. The majority concludes that the selection process, that which

---

convictions in his case; Ring therefore does not challenge *Almendarez–Torres v. United States,* which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. Finally, Ring does not contend that his indictment was constitutionally defective." *Id.* (citations omitted) (emphasis added).

determines whether in the judgment of the jury, the death penalty should be applied, may constitutionally be determined based on the preponderance of the evidence. *See* maj. op. at 209–11.

The majority's sole focus is upon the eligibility phase of the sentencing process. The majority concludes that "the [Supreme] Court's Eighth Amendment jurisprudence and its holding in *Ring* make clear, it is the finding of an aggravating circumstance, and only the finding of an aggravating circumstance, which makes a defendant death-eligible." Maj. op. at 255–56. The majority recognizes that "states must specify aggravating factors in order to direct and limit the sentencing authority's discretion as to the class of convicted defendants to which the death penalty may apply." *See* maj. op. at 219.

The Supreme Court's discussion of eligibility versus selection arose in the context of the Court's requirement that a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty. The Supreme Court has stated that the cruel and unusual prohibition of the Eighth Amendment prohibits a state from imposing the death penalty in an arbitrary and capricious manner. Accordingly, the sentencing authority must be provided with standards which will genuinely narrow the class of crimes and the persons against whom the death penalty is imposed by allowing it to make an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. 862, 878–80, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 250–51 (1983); *Gregg v. Georgia,* 428 U.S. 153, 206–07, 96 S.Ct. 2909, 2940–41, 49 L.Ed.2d 859, 893 (1976); *Furman v. Georgia,* 408 U.S. 238, 293–94, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346, 380–81 (1972) (Brennan, J., concurring).

The majority ignores several important considerations. First, the majority underestimates the impact and reach of *Ring.* It has been said of *Ring v. Arizona* that it is "clearly the most significant death penalty decision of the U.S. Supreme Court since the decision in *Furman v. Georgia,* 408

U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), invalidating the death penalty schemes of virtually all states." *Bottoson v. Moore*, 833 So.2d 693 (Fla.2002) (Anstead, C.J., concurring). *Ring* has been called a "monumental decision that will have extensive implications across the country." Note, The Death Penalty and the Sixth Amendment: How Will the System Look After *Ring v. Arizona?*, 77 St. John's L.Rev. 371, 399 (2003). *Ring* discusses the death penalty for the first time within the framework of the Sixth Amendment. It has been suggested that the Supreme Court's overruling of *Walton* raises questions about the viability of earlier capital cases. *See* Stevenson, *supra*, at 1111, 1122 (noting that "A central difficulty in resolving these second-stage issues is that the jurisprudential tools that one would naturally use to analyze the questions-the Supreme Court's prior decisions on the jury's role in capital sentencing-are now inherently suspect in light of *Ring*.").

But even if the "eligibility" versus "selection" distinction holds in the context of the weighing process, the language and structure of the Maryland statute put the weighing process on the eligibility side rather than the selection side. I reiterate my analysis in *Borchardt:*

"Under § 412(b), a defendant is not 'death-eligible' merely by having been found guilty of first degree murder. Rather, at the conclusion of the guilt/innocence phase and a finding of guilty of first degree murder, the defendant is eligible only for a sentence of life imprisonment. The defendant cannot receive a sentence of death unless the additional requirements of § 413 have been met, *i.e.,* that at least one aggravating factor has been proven, that the defendant is a principal in the first degree, and that the aggravating circumstance[s] outweigh any mitigating circumstances. *See* § 413(h). Just as the presence of the hate crime enhancement in *Apprendi* transformed a second degree offense into a first degree offense under the New Jersey hate crime statute, the finding that the aggravating circumstances outweigh the mitigating circumstances trans-

forms a life sentence into a death sentence under the Maryland death penalty statute."

367 Md. at 154–55, 786 A.2d at 668–69.

## VI. State Grounds

In addition to affronting the guarantee of federal due process, Maryland's death penalty scheme violates Article 24 of the Maryland Declaration of Rights and the basic principles of fundamental fairness guaranteed by the State Constitution. Article 24 of the Maryland Declaration of Rights provides, in pertinent part, "That no man ought to be ... deprived of his life, liberty or property, but ... by the Law of the land." Long before *Apprendi*, Maryland law recognized that any fact relating to the circumstance of an offense that exposed a defendant to enhanced punishment had to be determined by the trier of fact beyond a reasonable doubt. *See, e.g., Fisher & Utley v. State*, 367 Md. 218, 280–82, 786 A.2d 706, 743–44 (2001) (holding that imposition of enhanced penalty under child abuse statute where abuse causes the death must be alleged and proven beyond a reasonable doubt); *Wadlow v. State*, 335 Md. 122, 132, 642 A.2d 213, 218 (1994) (holding that when the State seeks enhanced penalties, provided by statute, for possession of cocaine with intent to distribute, the State must allege the necessary fact concerning the amount of controlled dangerous substance, and prove that fact beyond a reasonable doubt); *Jones v. State*, 324 Md. 32, 37, 595 A.2d 463, 465 (1991) (holding that for imposition of enhanced penalty provided for by Legislature, the State must prove all statutory conditions precedent beyond a reasonable doubt).

Permitting a jury to sentence a person to death based on a preponderance of the evidence standard, *i.e.*, that death is more appropriate than not, offends Maryland due process and principles of fundamental fairness. *Cf. State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130, 151, 156 (1987); *State v. Wood*, 648 P.2d 71, 80–81 (Utah 1981).

The allocation of a particular burden of proof reflects the gravity of the task before the factfinder, the relative impor-

tance of the decision, and "a fundamental value determination of our society[.]" *In re Winship*, 397 U.S. at 372, 90 S.Ct. at 1077, 25 L.Ed.2d at 380 (Harlan, J., concurring). In *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), Chief Justice Burger expressed for the Court the significance of the highest level of requisite proof as follows:

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship*, 397 U.S. 358, 370[, 90 S.Ct. 1068, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship, supra.*"

*Id.* at 423–24, 99 S.Ct. at 1808, 60 L.Ed.2d at 329 (footnote omitted). The more serious the risk of error, the higher the requisite standard of proof.

Included within step three of the Maryland statute, the weighing provision, is the ultimate decision that death is the appropriate sentence. The reasonable doubt standard communicates to the jury the degree of certainty it must possess before arriving at the ultimate decision that death is the proper sentence. *See State v. Rizzo,* 266 Conn. 171, 833 A.2d 363 (2003);[7] *People v. Tenneson,* 788 P.2d 786, 795 (Colo. 1990).

We pay mere lip service to the principle that death is different and yet continue to impose a lower level of certainty in the death penalty context than we do for other lesser important interests in Maryland. Maryland has required a higher burden of persuasion than preponderance of the evidence in situations involving penalties far less severe than the ultimate penalty at stake under § 413. *See, e.g., 1986 Mercedes v. State,* 334 Md. 264, 282–83, 638 A.2d 1164, 1173 (1994) (requiring the state to prove the requisite elements under drug forfeiture laws by clear and convincing evidence); *Mack v. Mack,* 329 Md. 188, 207, 618 A.2d 744, 753 (1993) (requiring

---

7. In *State v. Rizzo,* 266 Conn. 171, 238 n. 37, 833 A.2d 363, 408 n. 37 (2003), the Connecticut Supreme Court rejected the dissent's argument that the jury's determination in the weighing process is a moral judgment, inconsistent with a reasonable doubt standard. The court reasoned as follows:

"We disagree with the dissent of Sullivan, C. J., suggesting that, because the jury's determination is a moral judgment, it is somehow inconsistent to assign a burden of persuasion to that determination. The dissent's contention relies on its understanding of the reasonable doubt standard as a quantitative evaluation of the evidence. We have already explained in this opinion that the traditional meaning of the reasonable doubt standard focuses, not on a quantification of the evidence, but on the degree of certainty of the fact finder or, in this case, the sentencer. Therefore, the nature of the jury's determination as a moral judgment does not render the application of the reasonable doubt standard to that determination inconsistent or confusing. On the contrary, it makes sense, and, indeed, is quite common, when making a moral determination, to assign a degree of certainty to that judgment. Put another way, the notion of a particular level of certainty is not inconsistent with the process of arriving at a moral judgment; our conclusion simply assigns the law's most demanding level of certainty to the jury's most demanding and irrevocable moral judgment."

clear and convincing evidence for the withdrawal of life-sustaining medical treatment); *Owens–Illinois v. Zenobia,* 325 Md. 420, 469, 601 A.2d 633, 657 (1992) (requiring the clear and convincing evidence standard for proof of punitive damages); *Washington County Dep't of Soc. Serv. v. Clark,* 296 Md. 190, 197, 461 A.2d 1077, 1081 (1983) (requiring proof of parental unfitness by clear and convincing evidence in order to terminate parental rights); *Coard v. State,* 288 Md. 523, 525, 419 A.2d 383, 384 (1980) (requiring proof by clear and convincing evidence in civil commitment proceedings); *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980) (requiring the heightened evidentiary standard of clear and convincing evidence for libel and slander). *Cf. Summerlin v. Stewart,* 341 F.3d 1082, 1123 (9th Cir.2003) (stating that "We do not execute people according to ordinary legal principles that may be good enough for our more routine decisions. When the state assumes the role of the Deity, it must exercise greater care."); *see also Addington,* 441 U.S. at 425, 99 S.Ct. at 1809, 60 L.Ed.2d at 330 (stating that "[i]n cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.' ").

### VII. The Reasonable Doubt Standard

It is correct that states must *narrow* the class of persons deemed to be death-eligible, in order to eliminate total arbitrariness and capriciousness in the imposition of the death penalty. But reliability is equally as important. Even assuming *arguendo* that the weighing portion of Maryland's death penalty scheme is purely a matter of selection, which I do not accept, I would nonetheless hold that a finding that aggravating factors outweigh mitigating factors should be determined beyond a reasonable doubt. A jury engaging in the relative comparison of aggravating factors to mitigating factors is making the final determination of whether to grant mercy and spare a defendant's life. It seems entirely incongruous that we should require the highest standards of proof when a jury decides whether a defendant is "eligible" to be executed, yet

lower the bar when the jury decides whether or not the defendant is "eligible" to be spared. These life and death decisions are two sides of the same coin and they should be subject to the same level of proof.

Requiring a finding "beyond a reasonable doubt" that a defendant should be given a death sentence is in line entirely with the procedural safeguards of Maryland's death penalty scheme. A death penalty sentencing phase differs markedly from a typical sentencing in Maryland. In Maryland, a jury may impose a sentence *only* in a death penalty proceeding. In all other cases, a judge imposes the sentence. In the capital case sentencing phase, evidence is presented, a jury must pass judgment on this evidence, and the rules of evidence, although somewhat relaxed, are in force.[8] If the State must prove, beyond a reasonable doubt, every element of a crime, why should it not need to prove every element of a capital murder proceeding in the punishment phase?

Reflected throughout the Supreme Court jurisprudence underlying the Eighth Amendment is the principle that death is different. *See, e.g., Ring,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556; *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335, 347 (1986) (plurality opinion) (noting that "This especial concern [for reliability in capital proceedings] is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 401 (1977) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976) (plurality opinion); *Furman,* 408 U.S. at 289, 92 S.Ct. at 2752, 33 L.Ed.2d at 378 (Brennan, J., concurring). In a death proceeding, the Supreme Court has recognized that "the Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a noncapital case." *Gilmore v. Taylor,* 508 U.S. 333, 342, 113 S.Ct. 2112, 2117, 124 L.Ed.2d

---

**8.** A question arises as to whether *Ring* requires strict rules of evidence during the entire post-conviction part of a death penalty trial.

306, 318 (1993). Justice Kennedy has observed that "all of our Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense." *Sawyer v. Smith*, 497 U.S. 227, 243, 110 S.Ct. 2822, 2832, 111 L.Ed.2d 193, 212 (1990).

*Ring* dealt with the Sixth Amendment right to a jury trial. Not to be overlooked, however, is the right to a fair and *reliable* sentencing determination. Throughout the jurisprudence on the death penalty is the universal recognition that death is different. *See Zant*, 462 U.S. at 884–85, 103 S.Ct. at 2747, 77 L.Ed.2d at 255 (noting that "because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' ") (quoting *Woodson*, 428 U.S. at 305, 96 S.Ct. at 2991, 49 L.Ed.2d at 961); *Gardner*, 430 U.S. at 357, 97 S.Ct. at 1204, 51 L.Ed.2d at 401. Because the death penalty is qualitatively different from a prison sentence, the Supreme Court, and our Court, requires that the death penalty may not be imposed unless the jury makes an individualized determination that death is the appropriate sentence for the particular defendant. *Woodson*, 428 U.S. at 303–04, 96 S.Ct. at 2991, 49 L.Ed.2d at 960–61. In *Furman*, 408 U.S. at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (Stewart, J., concurring), Justice Stewart stated:

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."

Because death is fundamentally different, heightened reliability is required at all stages of a death penalty trial. That includes the guilt/innocence phase, and the *entire* sentencing process. In discussing the unique nature of capital punishment, Justice Stevens in dissent noted in *Murray v. Giarratano*, 492 U.S. 1, 22 n. 9, 109 S.Ct. 2765, 2777 n. 9, 106 L.Ed.2d 1, 19 n. 9 (1989), as follows:

"In 1983, 11 years after *Furman* had been decided, Justice O'Connor observed in a majority opinion that the 'Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a corresponding-ly greater degree of scrutiny of the capital sentencing determination.' *California v. Ramos,* 463 U.S. 992, 998–999[, 103 S.Ct. 3446, 77 L.Ed.2d 1171]; *see id.,* at 999, n. 9[, 103 S.Ct. 3446] (citing cases). *See also, e.g., Ford v. Wain-wright,* 477 U.S. 399, 41[, 106 S.Ct. 2595, 91 L.Ed.2d 335] (1986) (Marshall, J., plurality opinion) ('In capital proceed-ings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliabili-ty. . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different'); *Ake v. Oklahoma,* 470 U.S. 68, 87[, 105 S.Ct. 1087, 84 L.Ed.2d 53] (1985) (Burger, C.J., concurring in judgment) ('In capital cases the finality of the sentence imposed warrants protec-tions that may or may not be required in other cases'); *Gardner v. Florida,* 430 U.S. 349, 357–358[, 97 S.Ct. 1197, 51 L.Ed.2d 393] (1977) (Stevens, J., plurality opinion) ('From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion')."

In sum, the touchstone of *Apprendi,* applied to capital cases in *Ring,* is to decide whether a requisite finding exposes the defendant to a higher sentence than can be imposed solely on the basis of a criminal conviction. As the *Ring* Court stated, "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring,* 536 U.S. at 602, 122 S.Ct.

at 2439, 153 L.Ed.2d at 572. Because in Maryland the finding that aggravating factors outweigh mitigating factors is a necessary predicate for the imposition of the death penalty, *Apprendi* and *Ring* require that this finding be made, by a jury, and not by a preponderance of the evidence, but beyond a reasonable doubt.

Chief Judge BELL and Judge ELDRIDGE authorize me to state that they join in this dissenting opinion.